JOHN J. WATERS AND JEANNE M. WATERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Waters v. Commissioner
Docket No. 9983-88
United States Tax Court
T.C. Memo 1991-462; 1991 Tax Ct. Memo LEXIS 511; 62 T.C.M. (CCH) 778; T.C.M. (RIA) 91462; September 23, 1991, Filed *511 Decision will be entered under Rule 155. Stephen D. Gardner and Michael G. Lefkowitz, for the petitioners. Jody Tancer and Laurie B. Kazenoff, for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Year
Deficiency
Sec. 6661 Addition to Tax [1]
1982
$ 14,361
$ 3,590
1983
20,258
5,065
1984
18,700
4,675
1985
2,443
-- Increased interest under section 6621(c) also was determined for each year. The primary issues for decision are: (1) Whether petitioner John J. Waters (petitioner) was at risk within the meaning of section 465 with respect to debt obligations incurred in connection with an investment in peripheral computer equipment; (2) whether petitioner's investment was a sham transaction devoid of economic substance; *512 and (3) whether petitioner's investment constituted an activity entered into for profit within the meaning of section 183. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife and resided in Huntington, New York, at the time their petition was filed. During the years in issue, petitioner was a certified public accountant. In early 1982, petitioner and Gerald A. Moffatt (Moffatt), one of petitioner's partners at the public accounting firm at which petitioner worked, sought advice from Michael Gorin (Gorin) concerning possible investments in computer equipment leasing transactions. Gorin was a certified public accountant and had performed accounting and financial services for computer equipment leasing companies, and Gorin had given advice to other investors concerning investments in computer equipment leasing transactions. Further, Gorin had experience purchasing computer equipment for a prior employer. On August 31, 1982, after considering and discussing for a number of months with Gorin and other colleagues various investment opportunities, including computer equipment leasing transactions, and after investigating the *513 credit standing of the prospective end user of the equipment, petitioner and Moffatt entered into the transactions with respect to certain peripheral computer equipment described below. Original Purchase Transaction and End-User Lease
On March 26, 1981, Equitable Financial Management, Inc. (Equitable), a general equipment leasing company, entered into a master purchase agreement to purchase a large quantity of new peripheral computer equipment from ITT Courier, Inc. (ITT), the manufacturer of the equipment. Equitable's purchase price for the particular computer equipment that is at issue in this case (and that was purchased from ITT under the referred-to master purchase agreement) was $ 278,775. The equipment included display terminals, keyboards, printers, printer interfaces, and remote terminal controllers. The equipment was to be delivered in stages throughout 1981 and 1982. ITT peripheral computer equipment was highly regarded in the computer industry. The particular controllers purchased by Equitable had a redundancy feature that made them particularly attractive to financial institutions, utility companies, and other end users whose business necessitated computer *514 equipment with backup capability. [2]
Charles L. Dixon (Dixon) was the president of Equitable. Fred E. Cooper (Cooper) was the corporate secretary. During the years in issue, Dixon and Cooper each owned 50 percent of the voting and nonvoting stock of Equitable, with the exception of a small minority stock interest held by another individual. In connection with its purchase of the computer equipment, Equitable borrowed on a nonrecourse basis from The First National Bank of Allentown approximately the full stated *515 purchase price of the equipment. The proceeds from the nonrecourse bank loan were used by Equitable to pay ITT the purchase price of the computer equipment. The loan was subsequently refinanced on a nonrecourse basis by another bank. As collateral for the bank loan, Equitable gave the bank security interests in the computer equipment and in the lease payments due under all end-user leases of the equipment. Neither the term of, nor the interest rate due, on Equitable's bank loan is established in the record. The $ 278,775 purchase price (for the computer equipment that is in issue in this case and that was purchased by Equitable from ITT) reflected a 7- to 10-percent discount from ITT's list price for the equipment because the purchase was part of a purchase by Equitable from ITT under the master purchase agreement of a much larger quantity of computer equipment. On April 6, 1981, Equitable entered into a master end-user lease agreement with Duquesne Light Co. (Duquesne Light), a public utility company located in Pittsburgh, Pennsylvania, with respect to the peripheral computer equipment purchased from ITT. The initial terms of the various end-user leases with Duquesne Light *516 began on either March 16, 1982, May 27, 1982, or August 16, 1982, and had terms of 5 years and 7 months, running (depending on the installation date at Duquesne Light of the various pieces of equipment) through March 16, 1988. During the initial 5-year 7-month lease terms, total monthly end-user lease payments in the amount of $ 6,953 were due from Duquesne Light with respect to the equipment. The monthly end-user lease payments effectively matched the payments due on Equitable's purchase money promissory note to the bank. Under lease renewal provisions, if Duquesne Light chose to renew the leases, Duquesne Light would pay the fair market rental rates at the time of renewal up to a maximum of 40-51 percent of the original lease rental rates. The end-user leases with Duquesne Light were net leases under which Duquesne Light was liable for all costs and expenses of maintaining the computer equipment. In order to fulfill its obligation in that regard, Duquesne Light entered into an equipment maintenance agreement with ITT with respect to the computer equipment, under which ITT (for a fee to be paid by Duquesne Light) was obligated to provide remedial and preventive maintenance throughout *517 the term of the end-user leases. Under the end-user lease agreements, Duquesne Light also was required to and did maintain casualty insurance on the computer equipment during the term of the end-user leases. Sale of Computer Equipment to Cooper Leasing and to Petitioner
On August 31, 1982, 17 months after the initial master purchase agreement for the purchase of computer equipment was entered into between Equitable and ITT, two additional and simultaneous transactions occurred (involving the particular computer equipment in issue in this case) with the objective of transferring ownership of the equipment and assignment of the end-user leases with respect to the equipment (subject to the security interests therein of the bank) to petitioner and to Moffatt. The first transaction was a sale of the computer equipment and assignment of the end-user leases by Equitable to Cooper Leasing Corporation, Inc. (Cooper Leasing), followed by the immediate resale of the computer equipment and reassignment of the end-user leases by Cooper Leasing to petitioner and to Moffatt. Both transactions were subject to the prior security interests of the bank in the equipment and in the end-user *518 lease payments. The total stated price for the purchase of the computer equipment by Cooper Leasing from Equitable was $ 298,000 (reflecting, among other things, the fact that ITT peripheral computer equipment had appreciated in value from March of 1981 to August of 1982). The total purchase price was to be paid with a cash downpayment of $ 1,000 and by the execution by Cooper Leasing in favor of Equitable of a purportedly recourse promissory note in the amount of $ 297,000. Interest was to accrue on the promissory note at 12 percent per year, and payments designated as prepaid interest, deferred interest, or interest were to be made as follows: $ 10,000 on August 31, 1982; $ 26,643 on February 28, 1983; $ 27,720 on February 28, 1984; $ 934 monthly from September of 1982 through December of 1984. Payments of principal and interest were to be made as follows: $ 5,806 monthly from January of 1985 through December of 1990. Cooper Leasing was in the general business of equipment and real estate leasing. The officers and ownership of Cooper Leasing were the same as the officers and ownership of Equitable, except that Fred E. Cooper was president of Cooper Leasing, and Charles L. *519 Dixon was the corporate secretary. Cooper and Dixon each owned 50 percent of the stock of Cooper Leasing. On August 31, 1982, simultaneously with the above transaction between Equitable and Cooper Leasing, Cooper Leasing sold the computer equipment to petitioner and to Moffatt as joint tenants for a stated purchase price of $ 300,000, represented by cash downpayments by petitioner and by Moffatt of $ 1,500 each and by the execution of separate 8-year and 4-month purchase money promissory notes by petitioner and by Moffatt each in the amount of $ 148,500, reflecting a total purchase money debt reflected by the promissory notes of $ 297,000. Petitioner's and Moffatt's debt obligations to Cooper Leasing under the promissory notes were secured by security interests in the equipment executed and filed in favor of Cooper Leasing. Interest was to accrue on petitioner's and Moffatt's promissory notes in favor of Cooper Leasing at 12 percent a year, and payments of prepaid interest, deferred interest, accrued interest, and principal with respect to each of the promissory notes were to be made in total amounts that matched the payment obligations of Cooper Leasing under its promissory note *520 to Equitable. Separate promissory notes in favor of Cooper Leasing were executed by petitioner and Moffatt reflecting their obligations to pay interest to Cooper Leasing of $ 26,643 on February 28, 1983, and $ 27,720 on February 28, 1984. In their separate written $ 148,500 purchase money promissory notes and in their promissory notes regarding the interest payments due on February 28, 1983, and February 28, 1984, petitioner and Moffatt are stated to be personally liable, on a fully recourse basis, for the full amount of the principal and interest due thereon. Leaseback of the Computer Equipment to Equitable
On August 31, 1982, simultaneously with the above two transactions, petitioner and Moffatt entered into an agreement leasing back the computer equipment to Equitable for a fixed term of 8 years and 4 months. Under the leaseback agreement, Equitable agreed to make monthly lease payments to petitioner and to Moffatt that essentially matched the monthly payments due from petitioner and from Moffatt under their promissory notes in favor of Cooper Leasing and the monthly payments due from Cooper Leasing under its promissory notes in favor of Equitable. Under a management *521 agreement between petitioner, Moffatt, and Cooper Leasing, Cooper Leasing was to collect directly from Equitable the monthly lease payments due from Equitable under the leaseback agreement with petitioner and Moffatt. From those payments, Cooper Leasing would credit petitioner's and Moffatt's monthly debt obligations to Cooper Leasing under their promissory notes to Cooper Leasing, and Cooper Leasing in turn would transfer the payments back to Equitable in payment of its (Cooper Leasing's) debt obligations to Equitable. For its services in handling the payments and the bookkeeping, Cooper Leasing was to retain a fee of $ 10 a month. In 1982, 1983, and 1984, as a result of the essentially offsetting lease and debt payment obligations, petitioner and Moffatt were to earn no net rental proceeds. In 1985 through 1988, petitioner and Moffatt would each earn $ 250 a year in net rental proceeds. In 1989 and later years, petitioner and Moffatt also would be entitled to additional net rental proceeds from Equitable based on a percentage of the net end-user rental proceeds Equitable realized from any re-lease of the equipment, as follows: 15 percent for 1989; 20 percent for 1990; and 50 *522 percent for 1991 and later years. On August 31, 1982, petitioner, Moffatt, and Equitable entered into a nonexclusive remarketing agreement under which Equitable, upon expiration of the lease agreement, could attempt to sell the used computer equipment. Under the agreement, Equitable would receive 25 percent of any net sales proceeds, and petitioner and Moffatt would receive the balance. A sale of the equipment had to be approved by petitioner and Moffatt. The leaseback agreement between petitioner, Moffatt, and Equitable provided an indemnification provision in favor of petitioner and Moffatt, as follows: [Equitable] will indemnify [petitioner and Moffatt] and protect defend and hold [petitioner and Moffatt] harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorneys' fees, wheresoever and howsoever arising which [petitioner and Moffatt] may incur by reason of any breach by [Equitable] of any of the representations by, or obligations of, [Equitable] contained in this Lease, the Equipment, claims of Senior Lienholders, Underlying Lessee, or the leasing, subleasing, use, operation or maintenance of the Equipment.
*523 The leaseback agreement also contained a typical provision obligating Equitable to maintain casualty, property, and liability insurance coverage on the equipment. On August 31, 1982, petitioner, Moffatt, Equitable, Cooper Leasing, and Parkside Associates (Parkside) entered into an agreement under which Parkside was to act as the manager or administrator of the various agreements between petitioner, Moffatt, Equitable, and Cooper Leasing. For its management services, Parkside was to be paid by Equitable $ 5,100 in August of 1982, $ 19,400 on February 28, 1983, and $ 8,000 on February 28, 1984. Parkside was in the business of providing consulting services to those engaged in the equipment leasing business and to investors in equipment leases. In 1984, the business of Parkside was taken over by Linwood Associates. Michael Gorin was the president and sole owner of Parkside and of Linwood. All aspects of the above sale and leaseback transactions were documented and recorded. Records were properly maintained of the income and expenses relating to the equipment. Under the various debt and lease obligations of the parties, total annual pretax cash flow available to petitioner and *524 to Moffatt relating to the above transactions would be as follows: During 1982 through 1984, $ 0; during each of 1985, 1986, 1987, and 1988, $ 500 ($ 250 to petitioner and $ 250 to Moffatt); during each of 1989, 1990, and 1991 and subsequent years, 15, 20, and 50 percent, respectively, of any net end-user lease proceeds received from Equitable (one half of which would be paid to petitioner and one half of which would be paid to Moffatt). A written financial analysis of the above transactions that was provided to petitioner and to Moffatt in August of 1982 with respect to their participation in the above transactions noted the tax benefits and reflected the limited net cash flow available to petitioner and to Moffatt in the early years of the investment. As of the time of trial, all lease payments due from Duquesne Light have been made, the equipment has been continuously and properly maintained and upgraded under the maintenance agreement with ITT, the end-user leases have been renewed by Duquesne Light at the maximum lease rental rates allowed (i.e., at 40-51 percent of the original rates), and all of the peripheral computer equipment was still on lease to Duquesne Light. Further, *525 the bank loan Equitable obtained to finance the purchase of the computer equipment from ITT has been fully paid. Also, amounts due Equitable from Cooper Leasing under Cooper Leasing's promissory note and amounts due Cooper Leasing under petitioner's and Moffatt's promissory notes have been paid. Petitioners' Federal income tax returns for 1982 through 1985 were filed with respondent using the cash method of accounting. Petitioners claimed thereon losses relating to the above equipment leasing transaction of $ 30,822 for 1982, $ 44,115 for 1983, $ 42,665 for 1984, and $ 12,213 for 1985. On petitioners' 1987 and subsequent years' Federal income tax returns, due to the "turnaround" of the financial aspects of the investment, petitioner reported the positive taxable income arising from the lease rentals received from Equitable in excess of depreciation and interest deductions claimed. On audit, respondent disallowed the net losses claimed for 1982, 1983, 1984, and 1985. OPINION At-Risk Issue
This and other courts have recently discussed at some length the at-risk limitations of section 465(b)(4) as they apply to multiparty equipment leasing transactions. See, e.g., Moser v. Commissioner, 914 F.2d 1040, 1047-1050 (8th Cir. 1990), *526 affg. a Memorandum Opinion of this Court; Casebeer v. Commissioner, 909 F.2d 1360, 1368-1370 (9th Cir. 1990), affg. on this issue, revg. in part, and remanding Larsen v. Commissioner, 89 T.C. 1229 (1987), and three memorandum opinions of this Court; American Principals Leasing Corp. v. United States, 904 F.2d 477, 482-483 (9th Cir. 1990); Thornock v. Commissioner, 94 T.C. 439, 447-454 (1990); Levy v. Commissioner, 91 T.C. 838, 862-865 (1988); Follender v. Commissioner, 89 T.C. 943, 949-950 (1987); Porreca v. Commissioner, 86 T.C. 821, 835-843 (1986). See also Raphan v. United States, 759 F.2d 879, 885 (Fed. Cir. 1985). It is not necessary to reiterate that discussion. It suffices herein to note that the nonrecourse nature of the underlying third-party bank debt, the offsetting payment obligations, and the indemnification agreement that in Thornock v. Commissioner, supra at 447-454, were held to immunize investors against any realistic economic risk of loss (with regard to their nominally recourse purchase *527 money debt obligations) are very similar to the nonrecourse third-party bank debt, the offsetting payment obligations, and the indemnification agreement that are presented to use in this case. Thornock v. Commissioner, supra, controls the resolution of the at-risk issue in this case. Paraphrasing our conclusions in that opinion (94 T.C. at 447-450), The First National Bank of Allentown and the bank that refinanced Equitable's purchase of the equipment from ITT on a nonrecourse basis looked only to the computer equipment and to the end-user lease payments as collateral. Neither Equitable, Cooper Leasing, Parkside, nor petitioner or Moffatt, had any liability or legal responsibility to see that the banks were repaid on the loan, except the responsibility to act in good faith with regard to other aspects of the transactions. Other than their rights with regard to the end-user lease payments and the collateral, the banks had no legal right to require any participant in the transactions to provide funds to pay off the nonrecourse bank loan. Dixon, the president of Equitable, testified that he personally regarded Equitable as fully liable on *528 a recourse basis on the bank loan and that Equitable would have insisted on full payment by Cooper Leasing and by petitioner and Moffatt of their debt obligations under their "recourse" promissory notes in order to insure that Equitable had the funds to pay the nonrecourse bank loan and thereby to protect Equitable's credit standing. Under the at-risk provisions of section 465, however, we are dealing primarily with the reality of the legal relationships and debt obligations under the agreements and written obligations as entered into and documented by the parties. The fact that particular individuals or representatives of debtors on nonrecourse debt obligations personally may believe that their company should or would voluntarily treat particular debt obligations as recourse is, in our opinion, essentially meaningless. As the transactions before us were structured, the banks had no recourse to Equitable, and Equitable had no personal liability on its promissory note to the banks. That fact and the other features and provisions of the transactions we have mentioned (particularly the indemnity agreement) establish that there was no realistic possibility that petitioner and Moffatt *529 would suffer an economic loss in connection with the transactions in issue. The cumulative effect of these provisions constitutes a prohibited "other similar arrangement" under section 465(b)(4) that effectively immunizes petitioner and Moffatt from any economic loss with respect to their debt obligations under their nominally recourse purchase money promissory notes in favor of Cooper Leasing. See also Moser v. Commissioner, supra, at 1049; Casebeer v. Commissioner, supra, at 1369. Petitioner argues that in spite of the protections built into the transactions, the bankruptcy of one of the parties to the transactions might result in an economic loss to petitioner. For example, petitioner argues that if the equipment became worthless in the fourth year of the end-user lease with Duquesne Light, Duquesne Light might stop making lease payments due Equitable, Equitable might stop making lease payments due petitioner and Moffatt, and petitioner and Moffatt might stop making payments due under their promissory notes to Cooper Leasing. Petitioner speculates that Cooper Leasing and/or Equitable might then assign or negotiate petitioner's *530 and Moffatt's "recourse" promissory notes to the bank, and that the bank might then enforce against petitioner and Moffatt the assigned "recourse" promissory notes, even though the bank originally had no recourse on its loan to Equitable. As we have previously explained, the "worst-case" analysis that is reflected in our opinions stops short of anticipating the potential bankruptcy or other financial adjustments that might occur if any of the participants providing the particular "protections-against-loss" get into financial difficulty. As stated in Thornock v. Commissioner, supra at 454, quoting from the legislative history of section 465 -- the potential bankruptcy of entities providing guarantees or loss protection to investors is not a consideration in determining the application of section 465(b)(4) unless and until the bankruptcy actually occurs. Capek v. Commissioner, 86 T.C. 14, 52 (1986). In this regard, the report of the Senate Finance Committee with respect to section 465 states as follows: For purposes of this rule [i.e., section 465(b)(4)], it will be assumed that a loss-protection guarantee, repurchase agreement *531 or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement. [S. Rept. 94-938 at 50 n.6 (1976), 1976-3 C.B. (Vol. 3) 49, 88. Fn. ref. omitted; emphasis added.]
See also in this regard, American Principals Leasing Corp. v. United States, 904 F.2d 477, 482 (9th Cir. 1990). Petitioner also argues that in 1982, when he first entered into the transactions, he should be considered to be at risk under section 465(b)(1) with respect to his debt obligations on the interest-only promissory notes due on February 28, 1983, and February 28, 1984, in the respective amounts of $ 26,643 and $ 27,720. We disagree. Under section 465(b)(1), a taxpayer *532 is to be regarded as at risk only with respect to: (1) Amounts of money and the adjusted basis of property actually contributed to the activity; and (2) amounts borrowed with respect to or for use in the activity. An obligation to pay interest in the future does not so qualify. Such an obligation does not constitute a contribution of money or property to the activity, nor does it constitute the borrowing of money. If money has been borrowed and is used in the activity, such money or loan proceeds may qualify under the at-risk rules, but interest on the associated debt does not qualify until it is paid. Porreca v. Commissioner, 86 T.C. 821 (1986), and Lansburgh v. Commissioner, T.C. Memo 1987-164, are not to the contrary. In Porreca v. Commissioner, supra at 847, we simply treated interest actually paid as part of the taxpayer's capital cost of the investment. Porreca is not authority for the proposition that an obligation to pay interest in the future is to be regarded as an amount with respect to which a taxpayer is at risk under section 465. In Lansburgh v. Commissioner, supra, a *533 taxpayer was considered at risk with respect to an obligation to pay interest not because the obligation reflected an obligation to pay interest, but because the obligation also constituted part of the price to convert the underlying debt obligations to nonrecourse obligations. Lansburgh v. Commissioner, supra, is distinguishable from the instant case on that basis. Petitioner is to be regarded as at risk with regard to the interest-only promissory notes only in the years petitioner's obligations thereunder were actually paid (namely, in 1983 and 1984). In light of the above resolution of the at-risk issues under section 465, it is not necessary to address respondent's alternative argument that under the remarketing agreement between petitioner, Moffatt, and Equitable, Equitable had fixed and definite rights in conflict with its creditor status that constituted a prohibited other interest under section 465(b)(3). Sham Transaction, Economic Substance, and Profit Objective
When analyzing the substance and form of business transactions, the reality that the tax laws affect the shape of most business transactions cannot be ignored. Frank Lyon Co. v. United States, 435 U.S. 561, 576-580, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978). *534 This principle is particularly appropriate where significant tax benefits are made available for the specific purpose of promoting and stimulating the precise type of investments in issue. Levy v. Commissioner, 91 T.C. 838, 853 (1988); Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). In general, equipment leasing transactions would appear to qualify as a type of significantly tax-motivated transaction that Congress intended to encourage. Levy v. Commissioner, supra at 871-872; Fox v. Commissioner, 82 T.C. 1001, 1021 (1984). It also is well established, however, that to be recognized for Federal income tax purposes, transactions must have a business purpose and economic substance apart from anticipated tax consequences. Knetsch v. United States, 364 U.S. 361, 366, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960); Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); Hulter v. Commissioner, 91 T.C. 371, 388 (1988). Where taxpayers resort to "the expedient of drawing up papers to characterize transactions contrary to objective *535 economic realities and which have no economic significance beyond expected tax benefits," the tax benefits claimed will be denied on the basis that the transactions were shams. Cooper v. Commissioner, 88 T.C. 84, 103 (1987); Falsetti v. Commissioner, 85 T.C. 332, 355 (1985). Examinations into the business purpose and economic substance of transactions are inherently factual. Levy v. Commissioner, supra at 854. It is often difficult to distinguish clearly between valid and invalid transactions. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 197 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). The business purpose inquiry tends to be an inquiry into the taxpayer's subjective purpose for entering into the transactions in issue. Levy v. Commissioner, supra at 854; Packard v. Commissioner, 85 T.C. 397, 417 (1985). The economic substance inquiry tends to be an analysis of objective factors indicating whether the transactions had a reasonable possibility of producing a profit. Levy v. Commissioner, supra at 854; *536 Packard v. Commissioner, supra at 417. See also Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. on this issue, revg. in part, and remanding Larsen v. Commissioner, 89 T.C. 1229 (1987), and three memorandum opinions of this Court; James v. Commissioner, 899 F.2d 905, 908-909 (10th Cir. 1990), affg. 87 T.C. 905 (1986); Friedman v. Commissioner, 869 F.2d 785, 792 (4th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Rose v. Commissioner, 868 F.2d 851, 854 (6th Cir. 1989), affg. 88 T.C. 386 (1987). In order to satisfy the profit-objective test and thereby to be entitled to claim the losses at issue in this case independently of the limitations of section 183, petitioner must also have entered into the investments with an actual and honest objective of making a profit. Cooper v. Commissioner, 88 T.C. 84, 108 (1987); Fuchs v. Commissioner, 83 T.C. 79, 98 (1984); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without *537 opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been reasonable, but the taxpayer must have entered into the activity with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Various factors set forth in the regulations under section 183 have been used in the analysis of whether the requisite profit objective exists. No one factor, however, is determinative. See sec. 1.183-2(b), Income Tax Regs. The resolution of whether a profit objective exists is to be made on the basis of all of the facts and circumstances. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner, supra at 426. More weight is to be given to objective facts than to self-serving statements of intention. Beck v. Commissioner, 85 T.C. 557, 570 (1985); Siegel v. Commissioner, 78 T.C. 659, 699 (1982). *538 We do not believe that the transactions before us constitute sham transactions lacking in economic substance. The equipment existed. It was essentially new, state of the art peripheral computer equipment that was highly regarded in the computer industry and that because of its special features had a particular niche in the market place. Most significantly, the stated purchase price for the equipment was not inflated. It reflected recent market price adjustments in ITT computer equipment, and the fair market value of the equipment was reflected at each level of the various transactions. The evidence is persuasive that the ITT peripheral computer equipment involved in this case was not as subject to technological obsolescence as was mainframe computer equipment and that the list price of such equipment tended to reflect the technological obsolescence that may have existed at the time of the sale. See also Mukerji v. Commissioner, 87 T.C. 926, 943 (1986). The equipment was already delivered, installed, and on lease with Duquesne Light under the existing end-user lease agreement, circumstances often justifying, as they do in this case, a lease premium in the *539 valuation of the equipment. Mukerji v. Commissioner, supra at 965. The equipment has been maintained and upgraded under the maintenance agreement with ITT. The equipment has been re-leased to Duquesne Light at the maximum lease renewal rates allowed under the lease renewal provisions, and it remains on lease through the time of trial. Petitioner's first expert witness began his valuation of the equipment with the nondiscounted list price of the peripheral computer equipment of ITT that is involved in this case and discounted that figure 10 percent for the unavailability of the investment tax credit. He factored into his valuation a 15-percent lease premium in light of the end-user lease with Duquesne Light, a 10-percent premium in light of the maintenance agreement, and a 5-percent premium in light of the insurance carried on the equipment by Duquesne Light. Petitioner's second expert witness based his valuation largely on a report he authored in 1981 under contract with the U.S. Government. That report evaluated and projected the future of the computer and data processing industry, and it projected future costs in 1990 and 1995 of specific types of *540 computer equipment including terminal display equipment. The conclusions set forth in petitioner's second expert's 1981 report and his report prepared for this case generally support a finding that the ITT peripheral computer equipment purchased by petitioner and Moffatt for $ 300,000 was purchased at or below its fair market value. Respondent's expert witness began his valuation with pricing information relating to IBM and Telex peripheral computer equipment that was only generally compatible with the ITT equipment involved in this case and which information was not available until after petitioner and Moffatt entered into the transactions in issue. Respondent's expert discounted the sales price that ITT charged Equitable by 20 percent for the unavailability of the investment tax credits. Respondent's expert offered no explanation as to why the discount would be 20 percent, twice the amount of the credit. Respondent's expert did not factor in any premiums for the existing end-user lease, for the maintenance agreement, for the insurance on the equipment carried by Duquesne Light, nor did he take into account the fact that the price Equitable paid ITT reflected a quantity discount *541 not available to petitioner or Moffatt individually. Respondent's expert also ignored the fact that ITT increased the price of its peripheral computer equipment in November of 1981. Lastly, respondent's expert did not properly account for the differences between the ITT terminal displays involved in this case and IBM terminal displays (particularly the redundancy feature of the ITT equipment). We summarize generally the opinions of petitioner's first expert witness, but we use a 5-percent factor for the lease premium, and of respondent's expert witness as follows: Petitioner's
Respondent's
1st Expert
Expert
List Price
$ 300,000 $ 278,775 Less Discount For:
No ITC
10% 20% Plus Premiums For:
Existing Lease
5%
0%
Maintenance
10% 0%
Insurance
5%
0%
Fair Market Value:
August 31, 1982
$ 329,870 $ 225,411 1982 Estimate of Residual
Value In 1992
33% - 0 - 1982 Estimate of Useful
Life
14-16 years 4-6 years We agree generally with the analysis and estimates utilized by petitioner's experts, and adopt the figures in the above summary reflecting the opinion generally of petitioner's first expert witness. With regard *542 to whether petitioner had an actual and honest profit objective for entering into the transactions in issue, many of the above factors are relevant. Additionally, we note that beginning in 1985, the fixed lease payments to be paid by Equitable to petitioner exceed the note payments due by petitioner to Cooper Leasing. Also, petitioner had the expectation that he would share in significant additional rentals on release of the equipment and that the equipment would have a significant residual value that would be realized on a resale of the equipment. The fair market purchase price paid for the equipment, the features of the equipment, the existing lease with Duquesne Light, the historical performance of the equipment, and the subsequent renewal of the lease by Duquesne Light, among other things, establish and corroborate petitioner's profit objective. We hold that the transaction before us in this case was not a sham transaction lacking in economic substance and that petitioner had an actual and honest profit objective for entering into the transaction. Other Issues
Based primarily on the arguments he made concerning the issue of sham transaction and profit objective, respondent *543 argues that petitioner and Moffatt did not acquire the benefits and burdens of ownership of the computer equipment, and that the underlying debt obligations were not genuine and therefore that interest actually paid on the debt obligations should not be deductible. Essentially for the same reasons we ruled in favor of petitioner on the sham transaction and the profit objective issues, we conclude that petitioner and Moffatt acquired ownership of the computer equipment and that the interest actually paid by petitioner on his written debt obligations associated with this transaction is deductible in the year paid. See Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), revg. on this issue 81 T.C. 184 (1983); Rose v. Commissioner, 88 T.C. 386, 423-424 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Respondent contends that additions to tax under section 6661 should be imposed because there was no substantial authority supporting the claimed treatment of the disallowed items. Sec. 6661(b)(2)(B)(i) and (ii). Petitioner argues that he had substantial authority for the deductions taken. In this *544 case, resolution of the only substantive issue decided against petitioner (namely, the at-risk issue) is based primarily on a conclusion drawn from very complex and interrelated contractual documents. Epsten v. Commissioner, T.C. Memo 1991-252. The underlying facts of this case are somewhat similar to the facts of a number of other published opinions of this Court in which equipment leasing transactions have been found to be valid investments. See, among others, Levy v. Commissioner, 91 T.C. 838 (1988); Gefen v. Commissioner, 87 T.C. 1471 (1986); Pearlstein v. Commissioner, T.C. Memo 1989-621. With regard to the at-risk issue, we cannot say that petitioner did not have substantial authority. See Levy v. Commissioner, supra; Gefen v. Commissioner, supra; Emershaw v. Commissioner, T.C. Memo 1990-246, on appeal (6th Cir., Sept. 21, 1990); Rubin v. Commissioner, T.C. Memo 1989-484; Moser v. Commissioner, T.C. Memo 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990); B & A Distributing Co. v. Commissioner, T.C. Memo 1988-589. *545 On the facts of this case, we conclude that petitioner had substantial authority for claiming the deductions relating to his participation in the equipment leasing transaction and that the addition to tax under section 6661 should not be imposed. Section 6621(c) provides for an increased rate of interest for substantial underpayments attributable to tax-motivated transactions. A substantial underpayment is an underpayment in excess of $ 1,000. Among the types of transactions considered to be tax motivated are losses disallowed as a result of the limitations of section 465(a). We have previously determined that petitioner's losses are limited by section 465(a). Petitioner is therefore liable for increased interest under section 6621(c). Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. The particular computer equipment at issue in this case and that was purchased by Equitable from ITT under the master purchase agreement and the listed prices associated with the different types of equipment are indicated below: ↩
No. of Units
Model
Price Per Unit
Total Price
3
7412-C
$ 14,490
$  43,470
3
7412-A
20,700
62,100
1
7502-3
990
990
14
2700-13
1,665
23,310
35
2700-13
2,300
80,500
17
8702
3,915
66,555
1
2700-03
1,850
1,850
Total Purchase Price
$ 278,775