MAHONEY, Circuit Judge:
 

 John J. and Jeanne M. Waters appeal from a decision of the United States Tax Court, Stephen J. Swift,
 
 Judge,
 
 which ruled,
 
 inter alia,
 
 that John Waters (“Waters”) was protected against loss, and therefore not “at risk” within the meaning of § 465 of the Internal Revenue Code of 1954,
 
 [1]
 
 with respect to a nominally recourse note executed in connection with his investment in the purchase and lease of peripheral computer equipment.
 
 Waters v. Commissioner,
 
 62 T.C.M. (CCH) 778 (1991).
 

 We affirm.
 

 Background
 

 John J. and Jeanne M. Waters, husband and wife, filed joint federal income tax returns for the years 1982 through 1985. They claimed on those returns losses attributable to Waters’ computer leasing activity, which we now describe.
 

 On March 26, 1981, Equitable Financial Management, Inc. (“Equitable”), an equipment leasing company, contracted to purchase a large quantity of new peripheral
 
 *1312
 
 computer equipment (the “Equipment”) from ITT Courier, Inc. (“ITT”) for $278,-775, reflecting a seven to ten percent quantity discount. The equipment was to be delivered in stages throughout 1981 and 1982.
 

 During the years at issue, Charles L. Dixon, president of Equitable, and Fred E. Cooper, its secretary, each owned fifty percent of the voting and nonvoting stock of Equitable, with the exception of a small minority stock interest held by another individual.
 

 Equitable financed approximately the full purchase price of the Equipment by borrowing, on a nonrecourse basis, from the First National Bank of Allentown (“Allentown”). Equitable granted Allentown a security interest in the Equipment and assigned to Allentown the lease payments due under all end-user leases of the Equipment. Some or all of this loan was subsequently refinanced with another bank.
 

 On April 6, 1981, Equitable leased the Equipment to Duquesne Light Company (“Duquesne”) for an initial term of five years and seven months (from the date of installation of each particular piece of equipment) running through March 16, 1988. The lease terms were “net,” with all costs and obligations relating to the Equipment to be borne by Duquesne. The lease payments effectively matched Equitable’s payments on the bank loan.
 

 On August 31, 1982, Equitable sold the Equipment, subject to the end-user lease and bank liens, to Cooper Leasing Corp. (“Cooper Leasing”) for $298,000. The purchase price was paid with a cash payment of $1,000 and a recourse promissory note in the amount of $297,000. Interest was set at twelve percent per annum, and' payments designated as prepaid interest, deferred interest, or interest were to be made as follows: $10,000 on August 31, 1982; $26,643 on February 28, 1983; $27,720 on February 28, 1984; $934.25 per month from September 1982 through December 1984. Payments of $5,806.42 per month for principal and interest were to be made from January 1985 to December 1990. Cooper Leasing provided Equitable with a security interest in the Equipment and end-user lease to secure performance of the note obligations.
 

 Cooper Leasing was in the business of equipment and real estate leasing. In 1982, however, it was in the process of winding down its business activities and thereafter served as an intermediary between Equitable and third-party investors with respect to leasing transactions. Cooper was Cooper Leasing’s president and Dixon was its secretary. Cooper and Dixon each owned fifty percent of Cooper Leasing’s stock. Thus, the ownership and officers of Cooper Leasing were substantially the same as those of Equitable.
 

 Also on August 31, 1982, simultaneously with the sale of the Equipment by Equitable to Cooper Leasing, Waters and Gerald A. Moffatt each purchased a fifty percent undivided interest in the Equipment, subject to the end-user lease and bank liens, from Cooper Leasing for a stated purchase price of $300,000. Waters and Moffatt each made a cash payment of $1,500 and provided a recourse promissory note in the amount of $148,500. Interest was set at twelve percent per annum, and principal and interest payments were to be made at times and in amounts (when aggregated) that matched the payment obligations of Cooper Leasing under its promissory note to Equitable. Waters and Moffatt each provided Cooper Leasing with a security interest in the Equipment and end-user lease to secure performance of their note obligations.
 

 Contemporaneously with their purchase of the Equipment, Waters and Moffatt leased the Equipment to Equitable for an eight-year and four-month fixed term, coterminous with their promissory notes to Cooper Leasing and Cooper Leasing’s promissory note to Equitable. Equitable was to make monthly rental payments that essentially matched the monthly note payments due from Waters and Moffatt to Cooper Leasing and the monthly note payments due from Cooper.Leasing to Equitable. Additionally, the lease included the following indemnification provision:
 

 
 *1313
 
 [Equitable] will indemnify [Waters and Moffatt] and protect defend and hold [them] harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorneys’ fees, wheresoever and howsoever arising which [they] may incur by reason of any breach by [Equitable] of any of the representations by, or obligations of, [Equitable] contained in this Lease, the Equipment, claims of Senior Lienholders, Underlying Lessee, or the leasing, subleasing, use, operation or maintenance of the Equipment.
 

 There were no rental payments that corresponded with the nonmonthly interest payments under the Cooper Leasing, Waters, and Moffatt notes due August 31, 1982, February 28, 1983, and February 28, 1984. Approximately half of these payments, which flowed through to Equitable in an aggregate amount of $64,363, was apparently intended to fund payments on those dates to Parkside Associates, a leasing consultant retained by agreement dated August 31, 1982 (the “Management Agreement”) to act as the administrator or manager of the various contracts between Waters, Moffatt, Equitable, and Cooper Leasing. In any event, Waters concedes in his appeal brief that: “The obligations of Messrs. Waters and Moffatt on their Notes to Cooper Leasing essentially matched Cooper Leasing’s obligations on its note to Equitable, which essentially matched Equitable’s rent payment obligations under the Equitable Lease.” Further, as will appear, the Tax Court allowed Waters to deduct interest actually paid on his note obligations in the year of payment.
 

 The Management Agreement also provided that Cooper Leasing was to collect Equitable’s monthly rental payments on behalf of Waters and Moffatt and apply the rental payments (1) to discharge the monthly note payments due from Waters and Moffatt on their notes to Cooper Leasing, and then (2) to discharge Cooper Leasing's monthly obligations on its note to Equitable. Cooper Leasing was to retain a ten dollar monthly fee for these services.
 

 In summary, the resulting lease and ownership arrangements were as follows:
 

 • Waters and Moffatt owned the Equipment, subject to the bank liens and end-user lease.
 

 • The banks retained a security interest in the Equipment and were assigned the end-user lease payments.
 

 • Waters and Moffatt leased the Equipment to Equitable.
 

 • Equitable leased the Equipment to Du-quesne.
 

 The resulting payments were structured as follows:
 

 • Equitable was obligated, on a nonre-course basis, to make payments to the banks pursuant to the financing of the initial purchase of the Equipment from ITT.
 

 • Duquesne made monthly rental payments pursuant to the end-user lease to the banks that effectively matched Equitable’s obligations on the bank loan.
 

 • Equitable made monthly rental payments to Waters and Moffatt on its lease of the Equipment.
 

 • Waters and Moffatt made corresponding monthly note payments to Cooper Leasing on their purchase of the Equipment, which were satisfied by Cooper Leasing’s collection of the monthly rental payments from Equitable on behalf of Waters and Moffatt.
 

 • Cooper Leasing made corresponding monthly payments on its note to Equitable.
 

 As a result of depreciation, interest, and management fees stemming from his investment in the Equipment, Waters claimed deductions for losses on his Federal income tax returns for 1982 through 1985 as follows: $30,822 for 1982, $44,115 for 1983, $42,665 for 1984, and $12,213.59 for 1985. The Commissioner disallowed the losses, which resulted in asserted (1) income tax deficiencies for each year; (2) increased interest for each year because of a substantial underpayment of income taxes attributable to tax motivated transactions, pursuant to § 6621(c); and (3) as to all years except 1985, a twenty-five percent
 
 *1314
 
 addition to the assessed deficiency for substantial understatement of income tax, pursuant to § 6661. The disallowances were based primarily upon the Commissioner’s determinations that: (1) Waters did not have the benefits and burdens of ownership of the Equipment; (2) his Equipment transactions were not conducted for profit; (3) his Equipment transactions were sham or lacked economic substance; and/or (4) the loss deductions were limited by § 465. Waters filed a petition with the United States Tax Court seeking a redetermination of the asserted deficiencies, and a trial was held.
 

 The Tax Court determined that: (1) “the transaction before [it] in this case was not a sham transaction lacking in economic substance and [Waters] had an actual and honest profit objective for entering into the transaction,” 62 T.C.M. at 786; and that Waters “acquired ownership of the computer equipment and that the interest actually paid by [Waters] on his written debt obligations associated with the transaction is deductible in the year paid.”
 
 Id.
 
 (citing
 
 Rice’s Toyota World, Inc. v. Commissioner,
 
 752 F.2d 89 (4th Cir.1985);
 
 Rose v. Commissioner,
 
 88 T.C. 386, 423-24 (1987),
 
 aff'd,
 
 868 F.2d 851 (6th Cir.1989)).
 

 The court also ruled, however, that Waters was not at risk with respect to his debt obligation to Cooper Leasing within the meaning of § 465(a)(1)(A) and § 465(b) because that obligation was “protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements” within the meaning of § 465(b)(4). 62 T.C.M. at 782-84. Specifically, the court determined that the nonrecourse nature of the underlying bank debt, the circular, matching payment obligations, and the Equitable indemnification agreement
 

 establish that there was no realistic possibility that [Waters] would suffer an economic loss in connection with the transactions in issue. The cumulative effect of these provisions constitutes a prohibited ‘other similar arrangement’ under section 465(b)(4) that effectively immunize[d] [Waters] from any economic loss with respect to [his] debt obligations under [his] nominally recourse purchase money promissory note[] in favor of Cooper Leasing.
 

 Id.
 
 at 783.
 

 As a result of these rulings, the Tax Court reduced the income tax deficiencies assessed by the Commissioner for the years 1982-1984, and determined that Waters had made an overpayment for 1985. The court also determined that Waters had substantial authority for claiming the Equipment-related deductions, thus eliminating the § 6661 addition to tax,
 
 id.
 
 at 786, but that penalty interest should be imposed pursuant to § 6621(c).
 
 Id.
 
 at 787.
 

 Waters appeals, challenging the Tax Court’s ruling as to § 465. The Commissioner does not contest the Tax Court determinations in Waters’ favor.
 

 Discussion
 

 As a preliminary matter, we note that “ ‘[o]ur usual standards of review ... apply. The Tax Court’s legal conclusions will receive plenary review. Factual findings will be reversed only if “clearly erroneous.” ’ ”
 
 Bausch & Lomb Inc. v. Commissioner,
 
 933 F.2d 1084, 1088 (2d Cir.1991) (quoting
 
 Eli Lilly & Co. v. Commissioner,
 
 856 F.2d 855, 861 (7th Cir.1988) (quoting
 
 Anderson v. City of Bessemer City,
 
 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985))). Specifically, the Tax Court’s application of the at-risk rules of section 465 is a legal issue which we review
 
 de novo. See Moser v. Commissioner,
 
 914 F.2d 1040, 1044 n. 11 (8th Cir.1990);
 
 Casebeer v. Commissioner,
 
 909 F.2d 1360, 1368 (9th Cir.1990).
 

 The Tax Court determined that (1) the nonrecourse underlying bank debt, (2) the circular, matching payment obligations, and (3) the indemnification provided by Equitable to Waters cumulatively constituted an “other similar arrangement” under section 465(b)(4) by which Waters was effectively protected against loss in connection with his debt. 62 T.C.M. at 782-84. Waters contends, however, that he was not protected against potential economic loss by this arrangement, and therefore should
 
 *1315
 
 be considered at risk with respect to his recourse purchase money note to Cooper Leasing.
 

 In order to prevent taxpayers engaged in certain activities from deducting losses in excess of their actual economic investment therein, § 465(a)(1) provides that a taxpayer engaged in an activity to which § 465 applies may deduct “any loss from such activity for the taxable year ... only to the extent of the aggregate amount with respect to which the taxpayer is at risk ... for such activity at the close of the taxable year.” The general rule is that a taxpayer is at risk for the amount of cash invested in the activity and for amounts borrowed for which the taxpayer is personally liable. § 465(b)(1), (2). Section 465(b)(4) provides, however, that a taxpayer “shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or
 
 other similar arrangements
 
 [emphasis added].”
 

 Any loss disallowed under § 465 for a given taxable year “shall be treated as a [§ 465] deduction allocable to such activity in the first succeeding taxable year,” § 465(a)(2), and thus may be carried forward and claimed in a later year in which a risk materializes that was not operative at the close of any prior taxable year.
 
 See Moser,
 
 914 F.2d at 1049 (§ 465 deduction not allowed unless and until risk-precipitating event occurs or a realistic possibility develops that it might);
 
 American Principals Leasing Corp. v. United States,
 
 904 F.2d 477, 483 (9th Cir.1990) (same); S.Rep. No. 938, 94th Cong., 2d Sess. 48 (1976),
 
 reprinted in
 
 1976 U.S.C.C.A.N. 2897, 3484 (“Losses ... are suspended under this provision”).
 

 Although we have not previously addressed the impact of § 465 upon an equipment leasing transaction of the structure presented by this appeal, other circuits have done so, and with one exception have sided with the position taken by the Commissioner in this case. The leading case is
 
 American Principals,
 
 in which the Ninth Circuit observed that § 465 “nowhere explains the phrase ‘other similar arrangements,’ ” 904 F.2d at 482, but noted that “subsection 454(b)(4)’s use of the term ‘arrangement’ rather than ‘agreement’ indicates that a binding contract is not necessary for this subsection to be applicable,”
 
 id.
 
 at 482-83, and concluded:
 

 [T]he purpose of. subsection 465(b)(4) is to suspend at risk treatment where a transaction is structured — by whatever method — to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable. A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of this subsection. We must be guided by economic reality. If at some future date the unexpected occurs and the taxpayer does suffer a loss, or a realistic possibility develops that the taxpayer will suffer a loss, the taxpayer will at that time become at risk and be able to take the deductions for previous years that were suspended under this subsection. I.R.C. § 465(a)(2).
 

 Id.
 
 at 483 (citations omitted).
 

 The Eleventh and Eighth Circuits have adopted this rule.
 
 See Young v. Commissioner,
 
 926 F.2d 1083, 1088-89 (11th Cir.1991);
 
 Moser,
 
 914 F.2d at 1048. The Sixth Circuit takes a contrary View, however, agreeing with the view of the dissent in
 
 American Principals
 
 that the legislative history of § 465 “indicate[s] that a loss-limiting arrangement within the meaning of § 465(b)(4) is a
 
 collateral agreement
 
 protecting a taxpayer from loss
 
 after the losses have occurred,
 
 either by excusing him from his obligation to make good on the losses or by compensating him for losses he has sustained.”
 
 Emershaw v. Commissioner,
 
 949 F.2d 841, 849 (6th Cir.1991) (citing
 
 American Principals,
 
 904 F.2d at 487 (Hug, J., dissenting)).
 

 The legislative history upon which
 
 Emer-shaw
 
 relies,
 
 see
 
 949 F.2d at 848-49, is primarily the following excerpt from the Senate report accompanying the initial enactment of § 465 in 1976:
 

 [A] taxpayer’s capital is not “at risk” in the business, even as to the equity capital which he has contributed[,] to the
 
 *1316
 
 extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not “at risk” if he arranges to receive insurance or other compensation for an economic loss
 
 after the loss is sustained,
 
 or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement
 
 between himself and another person.
 

 S.Rep. No. 938 at 49,
 
 reprinted in
 
 1976 U.S.C.C.A.N. at 3485 (emphasis added, paralleling
 
 Emershaw).
 

 We do not regard this statement as dis-positive with respect to the meaning of “other similar arrangements” in § 465(b)(4). While the Senate report outlines some arrangements that fall within § 465(b)(4), it does not directly address the language of that provision or purport to provide an exhaustive description of its coverage.
 

 In any event, “ ‘[w]here ... the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.’ ”
 
 Toibb v. Radloff,
 
 — U.S. —, —, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991) (quoting
 
 Blum v. Stenson,
 
 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984)). Accordingly, our primary focus must be upon the language of § 465(b)(4). That language prompts disagreement with
 
 Emershaw
 
 's conclusion that the term “similar arrangements” under § 465(b)(4) encompasses only
 
 “collateral agreement[s]
 
 protecting a taxpayer from loss
 
 after the losses have occurred.” Emershaw,
 
 949 F.2d at 849. As
 
 American Principals
 
 points out, the statutory phrase is “similar arrangements,” not “agreements.” 904 F.2d at 482-83. Moreover, the “arrangements” may be “similar” not only to “guarantees” and “stop loss agreements,” but also to “nonrecourse financing,” ordinarily a
 
 prearrangement
 
 to protect against loss.
 
 [2]
 

 We join the Eighth, Ninth, and Eleventh Circuits in holding that § 465(b)(4) operates “to suspend at risk treatment where a transaction is structured — by whatever method — to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable.”
 
 American Principals,
 
 904 F.2d at 483;
 
 see also Young,
 
 926 F.2d at 1089;
 
 Moser,
 
 914 F.2d at 1048-49; S.Rep. No. 1263, 95th Cong., 2d Sess. 67 (1978),
 
 reprinted in
 
 1978 U.S.C.C.A.N. 6761, 7103 (§ 465 limits “at risk” treatment to “the amount the taxpayer has placed at risk and
 
 could actually lose
 
 from the activity” (emphasis added)). Economic reality is the touchstone of the required analysis.
 
 See Young,
 
 926 F.2d at 1088
 
 &
 
 n. 11;
 
 Moser,
 
 914 F.2d at 1048
 
 &
 
 n. 21;
 
 American Principals,
 
 904 F.2d at 483.
 

 In this case, there was no realistic possibility that Waters would suffer an economic loss if the underlying transaction became unprofitable. First, the circular nature of the arrangement between Waters and Mof-fatt, Cooper Leasing, and Equitable effectively immunized Waters from economic loss. Equitable was both the initial obligee and final obligor. The payments on Waters’ nominally recourse notes were essentially identical to the payments Waters was entitled to receive from Equitable on its lease. The only obligation outside the circle of transactions was a nonrecourse bank debt.
 

 Second, the virtual identity of the composition and control of Equitable and Cooper Leasing, the only entities transferring funds, belies any likelihood that Equitable would have stopped making lease payments. Although it is theoretically possible that one of the parties might have broken the chain of payments, there appears to have been no reason for this to occur.
 

 Third, if Equitable stopped making payments on its lease, it could only have ex
 
 *1317
 
 pected a chain reaction resulting in Waters and Moffatt, and then Cooper Leasing, ceasing to make payments as well. Any ensuing litigation would similarly have resulted in a chain reaction. Whether or not a litigant would be entitled to setoff in a particular court action, it is clear that once the dust settled, the claims among the parties would have cancelled each other out.
 

 Fourth, if Duquesne stopped making lease payments, the banks could have only looked to the Equipment to recover their funds. Although Dixon testified that he “personally regarded Equitable as fully liable on a recourse basis on the bank loan and that [in the event of a default] Equitable would have insisted on full payment by Cooper Leasing and by [Waters] and Mof-fatt of their debt obligations under their ‘recourse’ promissory notes,” 62 T.C.M. at 783, the Tax Court was not clearly erroneous in rejecting this testimony. In any event, the pertinent “arrangement” to be assessed at the close of each taxable year was the existing nonrecourse debt, not the theoretical possibility that its nonrecourse nature would be disregarded by Equitable in some future contingency.
 

 Waters contends that even if the nonre-course nature of the underlying bank debt would ordinarily protect him against loss, he was not so protected in this case because his recourse note was fully negotiable. We reject this argument. The structure of the transaction and parties at issue in this case, as well as the Management Agreement between the parties, made the possibility that Cooper Leasing would negotiate Waters’ note more theoretical than realistic. If at some future date the unexpected occurred and the note was negotiated to a third party, Waters might at that juncture become at risk and be able to take deductions unavailable in prior years.
 
 See
 
 § 465(a)(2). As discussed earlier, the operation of § 465 is to suspend and defer, rather than completely deny,' otherwise available deductions.
 

 Waters also contends that the matching payment obligations did not immunize Waters against loss, citing numerous Tax Court opinions, as well as
 
 Emershaw,
 
 in support of that view. We agree that the existence of a source of rental payments to cover a taxpayer’s note obligations does not in and of itself eliminate risk, as some of the cases cited by Waters make clear.
 
 See, e.g., Rubin v. Commissioner,
 
 58 T.C.M. (CCH) 25, 38 (1989) (mere fact that taxpayer would receive sufficient rent from third party to cover note payments did not result in § 465 exposure) (citing
 
 Gefen v. Commissioner,
 
 87 T.C. 1471 (1986));
 
 B & A Distrib. Co. v. Commissioner,
 
 56 T.C.M. (CCH) 958, 969 (1988) (same) (citing
 
 Gefen
 
 ). However, the additional factors presented here — the underlying non-recourse debt, the circular, matching payment obligations, and the Equitable indemnification — take this case well beyond an unadorned availability of rental payments to cover note obligations.
 

 Waters’ essential argument, invoking
 
 Emershaw,
 
 949 F.2d at 845, is that the “worst-case scenario” must be considered in applying § 465(b)(4) rather than year-end economic realities. We disagree. Rather, as stated in
 
 Moser:
 

 While it may be appropriate to examine the worst-case scenario in determining whether a taxpayer is personally liable for amounts that he has borrowed for use in an activity when applying § 465(b)(2),
 
 see Krause [v. Commissioner,
 
 92 T.C. 1003, 1017 (1989)], such an analysis is not proper when determining whether the “taxpayer has engaged in a loss-limiting arrangement prohibited by subsection 465(b)(4).”
 
 [American Leasing],
 
 904 F.2d at 482.
 

 Moser,
 
 914 F.2d at 1048.
 

 Moser
 
 drew support for this analysis from the pertinent Senate report, which states:
 

 For purposes of [subsection 465(b)(4) ], it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner’s interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer
 
 *1318
 
 becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement.
 

 S.Rep. No. 938 at 50 n. 6,
 
 reprinted in
 
 1976 U.S.C.C.A.N. at 2897, 3486 n. 6;
 
 see also American Principals,
 
 904 F.2d at 482 (quoting above passage from S.Rep. No. 938).
 

 Finally, the language of § 465(b)(4), which is addressed to arrangements that “protect[] against loss,” taken together with the overall structure of § 465, which defers rather than permanently disallows losses, encourages an interpretation of this statute which looks to year-end economic realities rather than worst-case scenarios. Because at the close of the tax years at issue Waters did not face any realistic possibility of loss from his Equipment-leasing activity, the Tax Court properly concluded that he was not “at risk” in those years within the meaning of § 465 with respect to his promissory note to Cooper Leasing.
 

 Conclusion
 

 The decision of the Tax Court is affirmed.
 

 [1]
 

 . All statutory references herein are to the Internal Revenue Code of 1954 (26 U.S.C.) as amended and in effect during the years at issue. The Code has since been redesignated as the Internal Revenue Code of 1986.
 
 See
 
 Tax Reform Act of 1986, Pub.L. No. 99-514, § 2, 100 Stat. 2085, 2095.
 

 As pertinent herein, § 465 provides:
 

 DEDUCTIONS LIMITED TO AMOUNT AT RISK.
 

 (a)
 
 Limitation to Amount at Risk.
 

 (1)
 
 In General.
 
 — In the case of—
 

 (A) an individual,____
 

 engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year.
 

 (2)
 
 Deduction in succeeding year.
 
 — Any loss from an activity to which this section applies not allowed under this section for the taxable year shall be treated as a deduction allocable to such activity in the first succeeding taxable year.
 

 (b)
 
 Amounts Considered at Risk.
 

 (1)
 
 In General.
 
 — For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including—
 

 (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and
 

 (B) amounts borrowed with respect to such activity (as determined under paragraph (2)).
 

 (2)
 
 Borrowed amounts.
 
 — For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—
 

 (A) is personally liable for the repayment of such amounts____
 

 (4)
 
 Exception.
 
 — Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.
 

 (5)
 
 Amounts at risk in subsequent years.
 
 — If in any taxable year the taxpayer has a loss from an activity to which subsection (a) applies, the amount with respect to which a taxpayer is considered to be at risk (within the meaning of subsection (b)) in subsequent taxable years with respect to that activity shall be reduced by that portion of the loss which (after the application of subsection (a)) is allowable as a deduction.
 

 (c)
 
 Activities To Which Section Applies.
 

 (1)
 
 Types of activities.
 
 — This section applies to any taxpayer engaged in the activity of—
 

 (C) leasing any section 1245 property (as defined in section 1245(a)(3)).
 

 (d)
 
 Definition of Loss.
 

 For purposes of this section, the term "loss” means the excess of the deductions allowable under this chapter for the taxable year (determined without regard to the first sentence of subsection (a)) and allocable to an activity to which this section applies over the income received or accrued by the taxpayer during the taxable year from such activity----
 

 [2]
 

 .
 
 In any event, so far as the outcome of this appeal is concerned, Equitable provided Waters with an indemnification that constitutes a collateral agreement to protect Waters against loss after it occurred.