T.C. Memo. 1995-458


UNITED STATES TAX COURT


RICHARD SANTULLI AND VIRGINIA SANTULLI, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 24495-89, 16527-93.    Filed September 26, 1995.


       These cases involve two similar transactions:  A
leasing company purchased equipment with funds borrowed
from a bank.  The leasing company leased the equipment
to an end-user.  Rent payments to be received from the
end-user were assigned to the bank as security for the
loan.  The leasing company then sold the equipment to a
middle company, which, in turn, sold the equipment to
P.  With regard to both of those sales, substantially
all of the purchase price was evidenced by a long-term
note and the equipment was acquired subject to both the
lease to the end-user and the security interest of the
bank.  P then leased the equipment back to the leasing
company.  Payments from the leasing company to P, from
P to the middle company, and from the middle company to
the leasing company were, with one small exception,
identical.  Sec. 465, I.R.C., limits deductions for
losses from certain activities to the amount for which
the taxpayer is "at risk".  Sec. 465(b)(4), I.R.C.,
provides that a taxpayer shall not be considered at
risk with respect to amounts protected against loss
through nonrecourse financing, guarantees, stop-loss
agreements, or other similar arrangements.

1. Held:  The ultimate test for determining whether a taxpayer is at risk pursuant to sec. 465(b)(4), I.R.C., is whether there is a realistic possibility of economic loss.  Based on the facts presented, P has not established that there was any realistic possibility that he would be subject to economic loss as a result of his long-term notes.

2.  Held further, Ps are subject to additions to tax under sec. 6653(a), I.R.C., for negligence.

3.  Held further, Ps are subject to additions to tax under sec. 6661, I.R.C., for substantial understatement of income tax liability.

4.  Held further, Ps are liable for the increased rate of interest imposed under sec. 6621(c), I.R.C., for substantial underpayments attributable to tax-motivated transactions.


Richard S. Kestenbaum and Bernard S. Mark, for petitioners.

Theodore R. Leighton, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  These two cases have been consolidated for trial, briefing, and opinion.  Respondent has determined deficiencies in income taxes, additions to tax, and increased interest as follows:

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6651(a)(1) | 6653(a)(1) | 6653(a)(2) |
| 1980 | $81,541.67 | $16,477.20 | $5,097.06 | --- |
| 1981 | 35,032.19 | 5,254.83 | 4,116.46 | 50% of interest due on $15,956 |
| 1982 | 246,433.50 | --- | 12,321.68 | 50% of interest due on $3,195 |
| 1983 | 411,000.00 | --- | 21,312.00 | 50% of interest due on $411,000 |

| | Additions to Tax | | Increased Interest |
| Year | Sec. 6659 | Sec. 6661 | Sec. 6621(c) |
| --- | --- | --- | --- |
| 1980 | --- | --- | Due on $81,541.67 |
| 1981 | $5,765.00 | --- | Due on $35,032.19 |
| 1982 | 5,680.80 | $56,874.38 | Due on $246,443.50 |
| 1983 | --- | 102,750.00 | Due on $411,000.00 |

For 1982 respondent determined an addition to tax under section 6661 of $4,734 as an alternative to the addition to tax under section 6659 shown.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The parties have filed a stipulation of settled issues, which is accepted by the Court. The issues remaining for decision are: (1) Whether petitioners' deductions for losses suffered on certain equipment leasing transactions are allowable, (2) whether the transactions were tax-motivated transactions, rendering petitioners liable for increased interest, and (3) whether petitioners are liable for certain additions to tax.

FINDINGS OF FACT

Introduction

Some of the facts have been stipulated and are so found. The stipulations of fact filed by the parties and the accompanying exhibits are incorporated herein by this reference.

Petitioners Richard and Virginia Santulli are husband and wife. They made joint returns of Federal income tax for the calendar years in issue. Petitioners resided in New York City at the time they filed the petitions herein. Hereafter, all references to petitioner shall refer to petitioner Richard Santulli.

Our remaining findings of fact are concerned with two equipment leasing transactions entered into by petitioner. One of those transactions involved computer equipment, and the other involved telecommunications equipment. The parties have characterized those transactions as the "computer equipment activity" and the "telecommunications equipment activity", respectively. We will adopt those characterizations.

The Computer Equipment Activity

Purchase by Sha-Li and Lease to BNY

Sha-Li Leasing Associates, Inc. (Sha-Li), is a New Jersey corporation involved in equipment sales and leasing. During the years in issue, petitioner was a director of Sha-Li. Sometime prior to January 1979, Sha-Li purchased certain computer equipment (the computer equipment), which it leased to the Bank of New York (BNY), pursuant to eight separate leases (the BNY leases). The dates of, terms of, and monthly rental obligations under the BNY leases are as follows:

| Date of Lease | Term | Monthly Rental |
|---------------|---------|----------------|
| 12/19/78 | 48 mos. | $1,177 |
| 12/19/78 | 48 mos. | 1,188 |

| | | |
|---|---|---|
| 12/17/78 | 48 mos. | 1,188 |
| 12/19/78 | 48 mos. | 1,188 |
| 12/19/78 | 48 mos. | 1,188 |
| 12/19/78 | 48 mos. | 1,188 |
| 12/19/78 | 48 mos. | 1,188 |
| 1/27/78 | 36 mos. | 3,381 |

Sha-Li had purchased the computer equipment with money borrowed from Manufacturers Hanover Leasing Corp. (MHLC). Sha-Li borrowed the money pursuant to agreements entitled "Assignment of Lease Without Recourse and Security Agreement" (the assignment agreements). Among other provisions, each assignment agreement contains the following: A statement that, as of the date of the agreement, unpaid rent under the related BNY lease exceeded the amount borrowed by Sha-Li pursuant to the agreement; an assignment to MHLC of Sha-Li's rights to the proceeds (principally rent) under the related BNY lease; a grant to MHLC of a security interest in the computer equipment subject to the related lease; and an agreement by MHLC to take no recourse against Sha-Li should the lessee default in the payment of any of its obligations as a result of the lessee's financial inability to meet those obligations.

Sale by Sha-Li to Proz

Proz Leasing Associates, Inc. (Proz), a New York corporation, was organized in June 1979 to be a "middle company" in leasing transactions. Pursuant to an agreement between Proz and Sha-Li dated as of June 30, 1979 (the Proz computer purchase agreement), Proz purchased the computer equipment from Sha-Li.

The Proz computer purchase agreement recites a purchase price of $449,700, payable as follows:

1.  $200 in cash payable to Sha-Li no later than December 31, 1979.

2.  $1,500 by delivery to Sha-Li of a recourse note concurrently with execution of the Proz computer purchase agreement.

3.  $11,500 by delivery to Sha-Li of another recourse note concurrently with execution of the Proz computer purchase agreement.

4.  $436,500 by delivery to Sha-Li of an installment note (the Proz computer installment note) concurrently with execution of the Proz computer purchase agreement.

The Proz computer installment note is interest bearing and calls for 96 monthly installment payments, each in the amount of $6,908.79, commencing on July 1, 1979.

In connection with Proz' purchase of the computer equipment from Sha-Li, Proz and Sha-Li also entered into an agreement entitled "Assumption Agreement" dated as of June 30, 1979 (the Proz assumption agreement). The Proz assumption agreement provides that Proz agrees to be bound by the obligations of Sha-Li contained in the assignment agreements and that Proz' ownership interest in the computer equipment shall be subordinate to the security interest granted to MHLC by the assignment agreements. Under the Proz assumption agreement, no recourse shall be had against Proz or Proz' officers, directors, or stockholders with respect to any such obligations assumed by Proz, and, as to Proz, all such obligations are nonrecourse obligations.

Sale by Proz to Petitioner

Pursuant to an agreement between petitioner and Proz dated as of June 30, 1979 (the petitioner computer purchase agreement), petitioner purchased the computer equipment from Proz. The petitioner computer purchase agreement recites a purchase price of $450,000 ($300 more than payable under the Proz computer purchase agreement), payable as follows:

1. $500 in cash payable to Proz no later than June 30, 1979.

2. $1,500 by delivery to Proz of a recourse note concurrently with execution of the petitioner computer purchase agreement.

3. $11,500 by delivery to Proz of another recourse note concurrently with execution of the petitioner computer purchase agreement.

4. $436,500 by delivery to Proz of a limited recourse installment note (the petitioner computer installment note) concurrently with execution of the petitioner computer purchase agreement.

The petitioner computer installment note is interest bearing and, identically with the Proz computer installment note, it calls for 96 monthly installment payments, each in the amount of $6,908.79, commencing on July 1, 1979.

The petitioner computer installment note gives petitioner the right to defer any or all note payments owed to Proz to the extent amounts due petitioner under a lease of the computer equipment to be entered into by petitioner with Sha-Li are not received when due. Amounts so deferred become due and payable to Proz when, and to the extent that, petitioner receives from Sha-

Li or Proz amounts due petitioner under petitioner's lease with Sha-Li. Amounts so deferred become due and payable on February 28, 1996, whether or not petitioner has then received from Sha-Li or Proz amounts due under petitioner's lease with Sha-Li. No interest accrues on amounts so deferred.

In connection with petitioner's purchase of the computer equipment from Proz, petitioner and Proz also entered into an agreement entitled "Assumption Agreement" dated as of June 30, 1979 (the petitioner computer assumption agreement). The petitioner computer assumption agreement provides that petitioner agrees to be bound by the obligations of Sha-Li contained in the assignment agreements and that petitioner's ownership interest in the computer equipment shall be subordinate to the security interest granted to MHLC by the assignment agreements. Under the petitioner computer assumption agreement, no recourse shall be had against petitioner with respect to any such obligations assumed by petitioner, and, as to petitioner, all such obligations are nonrecourse obligations.

Sha-Li, not Proz, negotiated with petitioner the terms of the petitioner computer installment note. Any accounting records concerning Proz' purchase and sale of the computer equipment have at all times been maintained by Sha-Li. Proz never monitored payments on the petitioner computer installment note. Proz relied on Sha-Li to manage the flow of all payments between Proz,

petitioner, and Sha-Li.  Proz never monitored or questioned Sha-Li's management of the payments.

Lease by Petitioner to Sha-Li

Pursuant to an agreement of lease between petitioner and Sha-Li dated as of June 30, 1979 (the Sha-Li lease), petitioner leased the computer equipment to Sha-Li.  The Sha-Li lease commenced as of July 1, 1979, and had a term of 96 months. "Fixed rent" was set at $6,928.79 a month.  Pursuant to the Sha-Li lease, Sha-Li was responsible during the term of the lease for all risk of physical damage to, or loss or destruction of, the computer equipment, unless caused by petitioner's willful misconduct or negligence.  Also pursuant to the Sha-Li lease, Sha-Li agreed to indemnify, hold harmless, and defend petitioner against certain losses, liabilities, claims, and other risks arising from or in connection with, among other things, (1) any default by Sha-Li under the Sha-Li lease and (2) any claim by "the holders of the Lien".  The term "Lien" is defined in the Sha-Li lease to include the term "Lien" as defined in the Proz computer purchase agreement.  In the Proz computer purchase agreement, the term "Lien" is defined as:  "The security interest in favor of * * * [MHLC], and the assignment of payments due under the * * * [BNY leases] to * * * [MHLC] * * * ".

Marketing Agreement

Pursuant to a marketing agreement between petitioner and Sha-Li dated as of June 30, 1979, petitioner appointed Sha-Li as marketing agent for the computer equipment after the termination or expiration of the BNY leases.

Payment History

Until December 1982, Sha-Li's payments of rent to petitioner pursuant to the Sha-Li lease, petitioner's payments to Proz pursuant to the petitioner computer installment note, and Proz' payments to Sha-Li pursuant to the Proz computer installment note were made by check. Payments were not always timely. For example, Sha-Li's payments due for July through September 1980 were not made until November 1980; petitioner's payments due for July through October 1980 were not made until November 1980.

Manufacturers and Traders Trust Co. (Manufacturers) is a financial institution located in New York City. During 1982, petitioner, Proz, and Sha-Li all maintained accounts at Manufacturers. In December 1982, each of petitioner, Proz, and Sha-Li gave instructions to Manufacturers concerning their respective accounts. All of the instructions were effective from November 1982 through June 1987. Sha-Li instructed Manufacturers to charge its account on the first day of each month in the

amount of $6,928.79 and to credit that amount to the account of petitioner.  Petitioner's and Proz' instructions were similar, except that petitioner's account was to be charged $6,908.79, with that amount to be credited to the account of Proz, and Proz' account was to be charged $6,908.79, with that amount to be credited to the account of Sha-Li.

The Telecommunications Equipment Activity

Purchase by RTS and Lease to U.S. Telephone

RTS Teleleasing Corp. (RTS) is a New York corporation involved in equipment sales and leasing.  The initials RTS in the name "RTS Teleleasing Corporation" stand for Richard T. Santulli (petitioner).  During the years in issue, petitioner indirectly owned 50 percent of the shares of stock of RTS.  On October 1, 1982, RTS purchased certain telecommunications equipment (the telecommunications equipment) from a corporation then known as U.S. Telephone Communications, Inc. (U.S. Telephone).  (U.S. Telephone is now known as U.S. Sprint.)  RTS purchased the telecommunications equipment for $3,610,205.  Also on October 1, 1982, RTS leased the telecommunications equipment back to U.S. Telephone pursuant to an agreement entitled "Master Agreement of Lease" (the U.S. Telephone lease).  The term of the U.S. Telephone lease is 60 months, commencing on October 1, 1982. U.S. Telephone's monthly rental obligation under the U.S. Telephone lease is $81,420.95.

RTS had purchased the telecommunications equipment in part with a loan of $3,239,620 from MHLC.  RTS borrowed that sum from MHLC pursuant to an agreement entitled "Loan and Security Agreement" (the loan agreement).  Pursuant to the loan agreement, RTS executed a promissory note (the RTS promissory note) to MHLC.  The RTS promissory note is interest bearing and calls for 58 monthly payments of $81,420.95, commencing on December 1, 1982.  Among other provisions, the RTS promissory note contains the following statement:

> MHLC ACKNOWLEDGES AND AGREES THAT THE PERSONAL LIABILITY OF * * * [RTS] WITH RESPECT TO PAYMENT OF SUMS EVIDENCED BY THIS NOTE IS LIMITED AND IS SUBJECT TO THE TERMS AND CONDITIONS CONTAINED IN THE SECURITY AGREEMENT.

Certain pertinent provisions of the loan agreement are as follows:

> 7.  <u>Payment from Amounts Due Under The Lease</u>.  MHLC and the Borrower agree that, except as otherwise provided in Section 15 hereof, payments due under the Note shall be made by the Lessee's payment of the rentals and other amounts due or to become due (including, without limitation amounts due as Stipulated Loss Value) under the Lease directly to MHLC; <u>provided</u>, <u>however</u>, that nothing contained herein shall be deemed to alter or diminish the Borrower's absolute and unconditional obligation to make the payments to MHLC required under the terms of the Note.
>
>      *   *   *   *   *   *   *
>
> 14.  <u>Default; Remedies</u>.  In the event:  (a) of a failure of the Borrower to pay any amount owing hereunder when due, and the continuation of such failure for a period of 30 days after the date when due; (b) of a failure by the Borrower to perform or

observe any other covenant, agreement or undertaking under this Agreement, or any covenant, agreement or undertaking under the Lease, or under any agreement contemplated by the second paragraph of Section 11 hereof to which Borrower is a party, or under any other agreement or document given to evidence or secure any of the Secured Obligations; (c) of the occurrence of an Event of Default (as therein defined) under the Lease or of a default by Lessee of its obligations under the Acknowledgment and Consent to Assignment referred to in Section 15 hereof; (d) that any representation or warranty, made by the Borrower in connection with this transaction, whether contained in the Lease, any related document, in this Agreement or any certificate or other related document delivered to MHLC in connection herewith, or in any of the agreements contemplated by the second paragraph of Section 11 hereof, shall prove to be incorrect or untrue in any material respect; * * * <u>then</u> in any such event, MHLC may accelerate the full amount of the then outstanding Secured Obligations in which event such amounts will become immediately due and payable by the Borrower without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived, and MHLC may thereafter pursue all of the rights and remedies with respect to the Collateral accruing to MHLC hereunder or by operation of law as a secured creditor under the Uniform Commercial Code or other applicable law, and all such available rights and remedies, to the full extent permitted by the law, shall be cumulative and not exclusive.

         *     *     *     *     *     *     *

16. <u>Borrower's Obligation</u>. MHLC and the Borrower agree that the Note and the obligations evidenced thereby are without recourse to the Borrower and the Borrower shall have no personal liability for the payment of the Secured Obligations. <u>Notwithstanding the</u> <u>foregoing</u>, <u>however</u>, the Borrower expressly agrees that if at any time a Default described in either of subsections 14(b) or (d) hereof shall have occurred and be continuing, then in such event, the Borrower will not be permitted to satisfy the payment of the Secured Obligations solely or exclusively from funds generated by MHLC's realization upon its liquidation of the Collateral, and, in such event, MHLC shall have unencumbered and unrestricted access to the Borrower

and its assets for the satisfaction thereof without proceeding initially or exclusively against the Collateral.

Section 9 of the loan agreement provides to MHLC certain "collateral security", including the following: An assignment to MHLC of RTS' rights to the proceeds (principally rent) under the U.S. Telephone lease and a grant to MHLC of a security interest in the telecommunications equipment.

Sale by RTS to Proz

Pursuant to an agreement between Proz and RTS dated December 30, 1982 (the Proz telecommunications purchase agreement), Proz purchased the telecommunications equipment from RTS. The Proz telecommunications purchase agreement recites a purchase price of $3,605,205, payable as follows:

1. $175,510 by check or wire transfer to RTS concurrently with the execution of the Proz telecommunications purchase agreement.

2. $3,429,695 by delivery to RTS of an installment note (the Proz telecommunications installment note) concurrently with the execution of the Proz telecommunications purchase agreement.

The Proz' telecommunications installment note is interest bearing. It provides for (1) an initial payment of $2,212.70 on December 31, 1982, (2) monthly payments of $34,296.96 for the next 24 months, and (3) monthly payments of $49,206.16 for the next 120 months. The initial payment and the next 24 payments are stated to be "interest only". The final 120 payments are stated to be "principal and interest".

The Proz' telecommunications note additionally gives Proz the right to defer payments on the petitioner telecommunications installment note if Proz fails to receive payments from petitioner under petitioner's "Limited Recourse Promissory Note - Security Agreement".  Amounts so deferred become due and payable to RTS when, and to the extent that, Proz receives such payments from petitioner.  In any event, Proz must pay all deferred amounts no later than December 31, 1999.  No interest accrues on amounts so deferred.

Pursuant to the Proz telecommunications purchase agreement, Proz acquired the telecommunications equipment subject to the loan agreement and the U.S. Telephone lease.

Sale by Proz to Petitioner

Pursuant to an agreement between petitioner and Proz dated December 30, 1982 (the petitioner telecommunications purchase agreement), petitioner purchased the telecommunications equipment from Proz.  The petitioner telecommunications purchase agreement recites a purchase price of $3,610,205 ($5,000 more than payable under the Proz telecommunications purchase agreement), payable as follows:

1.  $180,510 by check or wire transfer to RTS concurrently with the execution of the petitioner telecommunications purchase agreement.

2.  $3,429,695 by delivery to RTS of an installment note

> (the petitioner telecommunications installment note) concurrently with the execution of the Proz telecommunications purchase agreement.

The petitioner telecommunications installment note is captioned "Limited Recourse Promissory Note - Security Agreement". It is interest bearing, and petitioner's liability thereunder is limited. Proz is accorded a security interest in the telecommunications equipment. The note calls for payments identical with those called for under the Proz telecommunications note: (1) An initial payment of $2,212.70 on December 31, 1982, (2) monthly payments of $34,296.96 for the next 24 months, and (3) monthly payments of $49,206.16 for the next 120 months. The initial payment and the next 24 payments are stated to be "interest only". The final 120 payments are stated to be "principal and interest".

The petitioner telecommunications installment note additionally gives petitioner the right to defer payments on that note if petitioner fails to receive payments from RTS under petitioner's lease of the equipment to RTS. Amounts so deferred become due and payable to Proz when, and to the extent that, petitioner receives such payments from RTS. In any event, petitioner must pay all deferred amounts no later than December 31, 1999. No interest accrues on amounts so deferred.

Petitioner acquired the telecommunications equipment subject to the loan agreement and the U.S. Telephone lease.

Any accounting records concerning Proz' purchase and sale of the telecommunications equipment have at all times been maintained by RTS. Proz never monitored payments on the petitioner telecommunications installment note. Proz relied on Sha-Li to manage the flow of all payments between Proz, petitioner, and RTS. Proz never monitored or questioned Sha-Li's management of the payments.

### Lease by Petitioner to RTS

Pursuant to an agreement of lease between petitioner and RTS dated December 30, 1982 (the RTS lease), petitioner leased the computer equipment to RTS. The RTS lease commenced on December 30, 1982, and, subject to earlier termination, has a term of approximately 144 months. The RTS lease calls for payments of "Fixed Rent" identical with the payments called for under both the Proz telecommunications installment note and the petitioner telecommunications installment note: (1) An initial payment of $2,212.70 on December 31, 1982, (2) monthly payments of $34,296.96 for the next 24 months, and (3) monthly payments of $49,206.16 for the next 120 months. Pursuant to the RTS lease, RTS was responsible during the term of the lease for all risk of physical damage to, or loss or destruction of, the computer equipment, unless caused by petitioner's willful misconduct or negligence. In addition, the RTS lease provided for indemnification of the lessor (petitioner) as follows:

17.  Indemnification

17.1  Lessee will indemnify Lessor and protect, defend and hold him harmless from and against any and all loss, cost, damage, injury or expenses, including, without limitation, reasonable attorneys' fees, wheresoever and howsoever arising which Lessor, or any of his agents or employees, may incur by reason of any breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease or in any way relating to or arising out of this Lease, the Equipment or Underlying Leases; * * *

By a reference to the petitioner telecommunications purchase agreement, the term "Underlying Leases" is defined to be the U.S. Telephone lease.

Marketing Agreement

Pursuant to a "Remarketing Option" between petitioner and RTS dated December 30, 1982, RTS agreed, at petitioner's option, to act as petitioner's agent to remarket the telecommunications equipment as and when the RTS lease expired.

Payment History

Until September 1983, RTS' payments of rent to petitioner pursuant to the RTS lease, petitioner's payments to Proz pursuant to the petitioner telecommunications installment note, and Proz' payments to RTS pursuant to the Proz telecommunications installment note (together the telecommunications payments) were made by check.  The telecommunications payments were not always timely.  For example, neither petitioner, Proz, nor RTS made any payment due for January through July 1983 until December 1983.

In April 1983, RTS opened an account at Manufacturers. Beginning in September 1983, the telecommunications payments were made by Manufacturers charging and crediting the accounts of RTS, petitioner, and Proz. By letter dated July 23, 1983, petitioner instructed Manufacturers to charge petitioner's account and credit RTS' account in the following amounts: (1) $34,296.96 each month through and including December 1984 and (2) $49,206.16 each month commencing January 1985 through and including December 1994. From September 1983 to June 1990, Manufacturers complied with those instructions. Additionally, Manufacturers (1) charged RTS' account in like amounts and credited such amounts to Proz' account and (2) charged Proz' account in like amounts and credited such amounts to petitioner's account. As part of the telecommunications equipment activity, (1) petitioner had no obligation to make any payment to RTS, (2) RTS had no obligation to make any payment to Proz, and (3) Proz had no obligation to make any payment to petitioner.

Petitioners' Deductions

With regard to the computer equipment, petitioners reported the following on their tax returns for the years is issue:

|  | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|
| Income | $83,145 | $83,145 | $83,145 | $83,145 |
| Deductions | | | | |
| Depreciation | 94,438 | 73,450 | 73,450 | 73,450 |
| Interest | 45,816 | 41,322 | 41,322 | 56,185 |
| Losses | 57,109 | 31,627 | 31,627 | 46,490 |

With regard to the telecommunications equipment, petitioners reported the following on their tax returns for the years in issue:

|  | 1982 | 1983 |
|---|---|---|
| Income | $2,213 | $411,564 |
| Deduction |  |  |
| Depreciation | 541,531 | 794,245 |
| Interest | 2,213 | 411,564 |
| Losses | 541,531 | 794,245 |

OPINION

I. At-Risk Issue

A. Introduction

These cases involve two equipment leasing transactions entered into by petitioner and characterized by the parties as the "computer equipment activity" and the "telecommunications equipment activity" (together, the activities). Both activities comprised similar elements: A leasing company purchased equipment with funds borrowed from a bank. The leasing company leased the equipment to an end-user. Rent payments to be received from the end-user were assigned to the bank as security for the loan. The leasing company then sold the equipment to a middle company, which, in turn, sold the equipment to petitioner. With regard to both of those sales, substantially all of the purchase price was evidenced by a long-term note and the equipment was acquired subject to both the lease to the end-user

and the security interest of the bank.  Petitioner then leased the equipment back to the leasing company.

With regard to both activities, petitioners claimed deductions for both depreciation and interest on their Federal income tax returns.  With regard to both activities, the parties have stipulated:

1.  The activity was not a sham.

2.  Petitioner had a business purpose in entering the activity.

3.  Petitioner's investment in the activity had substance.

4.  Petitioner acquired the benefits and burdens of ownership in the activity.

The parties have further stipulated that petitioners' deductions for depreciation and interest in connection with the activities depend on the extent to which petitioner was "at risk" for each activity within the meaning of section 465.  We thus must determine with respect to each activity the extent to which petitioner was at risk.[1]

---

[1]    Respondent has proposed that we find that petitioner was not at risk with respect to petitioner's long-term note issued with respect to each activity (viz, the petitioner computer installment note and the petitioner telecommunications installment note).  Respondent has not requested that we find that petitioner lacked risk with respect to the cash and any short-term notes issued with respect to the activities.  We assume that respondent concedes that petitioner was at risk with respect to such cash and short-term notes as of the beginning of the activity here in question, and we will not further address such items.

B.  Section 465

Section 465 limits losses allowable to an individual in connection with certain activities, including the leasing of depreciable property, to the amount that the individual is at risk with respect to the activity at yearend.  See sec. 465 (a)(1), (c)(1)(C).  Respondent contends that, with respect to the long-term notes issued by petitioner in connection with both the computer equipment activity and the telecommunications equipment activity (viz, the petitioner computer installment note and the petitioner telecommunications installment note, respectively (together, the installment notes)), petitioner was not at risk because he was protected against loss within the meaning of section 465(b)(4).[2]

Section 465(b)(4) provides:

> Exception.--Notwithstanding any other provision of this
> section, a taxpayer shall not be considered at risk
> with respect to amounts protected against loss through
> nonrecourse financing, guarantees, stop loss
> agreements, or other similar arrangements.

In determining whether a taxpayer is protected against loss within the meaning of section 465(b)(4), we look to see whether

---

[2]     Additionally, respondent argues that petitioner is not at risk because he is not personally liable on the installment notes (see sec. 465(b)(1) and (2)) and, with respect to the computer installment note, petitioner is indebted to a party with an interest in the activity (Sha-Li) other than as a creditor (see sec. 465(b)(3)).  Respondent would disregard the existence of Proz.  Since we agree that petitioner was protected against loss within the meaning of sec. 465(b)(4), we need not address respondent's additional arguments.

there is any realistic possibility that the taxpayer ultimately will be subject to economic loss on the investment at issue. Levien v. Commissioner, 103 T.C. 120, 126 (1994).

> "[T]he purpose of subsection 465(b)(4) is to suspend at risk treatment where a transaction is structured--by whatever method--to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable. A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of this subsection. We must be guided by economic reality. If at some future date the unexpected occurs and the taxpayer does suffer a loss, or a realistic possibility develops that the taxpayer will suffer a loss, the taxpayer will at that time become at risk and be able to take the deductions for previous years that were suspended under this subsection. I.R.C., sec. 465(a)(2)."

Waters v. Commissioner, 978 F.2d 1310, 1315 (2d Cir. 1992) (quoting with approval American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990)), affg. T.C. Memo. 1991-462.

The question presented is one of fact, and petitioners bear the burden of proof. Rule 142(a). With regard to leasing activities, we scrutinize the economic reality of the transaction, focusing in particular upon the relationships between the parties, whether the underlying debt is nonrecourse, the presence of offsetting payments and bookkeeping entries, the circularity of the transaction, and the presence of any payment guarantees or indemnities. See Waters v. Commissioner, supra at 1316-1317; Young v. Commissioner, 926 F.2d 1083, 1088 (11th Cir. 1991), affg. T.C. Memo. 1988-440; Moser v. Commissioner, 914 F.2d

1040, 1049-1050 (8th Cir. 1990), affg. T.C. Memo. 1989-142; American Principals Leasing Corp. v. United States, supra; Levien v. Commissioner, supra; Thornock v. Commissioner, 94 T.C. 439, 453 (1990). No single feature of the transaction generally will control. E.g., Levien v. Commissioner, supra at 127.

We find no significant difference between the facts in this case and those in the cases cited above. For example, Waters v. Commissioner, supra, involved a similar leasing transaction whereby the taxpayer purchased computer equipment from a middle entity that purchased the equipment from a third party to which the taxpayers leased the equipment. The third party had purchased the equipment with nonrecourse bank loans and had leased it to an end-user. The bank held a security interest in the equipment and had received an assignment of the end-user lease payments. The taxpayer owned the equipment subject to the bank liens and the end-user lease. The lease payments due the taxpayer from the third party "essentially matched" the taxpayer's payments to the middle entity, which, in turn, "matched" the middle entity's payments to the third party. Id. at 1312-1313. Based on the following factors--matching payment obligations, underlying nonrecourse debt, circular, matching payments, and third party's promise of indemnification under the lease from the taxpayer-- the Court of Appeals for the Second Circuit concluded that there was no realistic possibility that the taxpayer would suffer an economic loss if the underlying

transaction became unprofitable.  Id. at 1317.  The Court of Appeals affirmed the holding of this Court that the taxpayer was not at risk under section 465(b)(4).  Id. at 1319.  Likewise, in Levien v. Commissioner, supra at 127-128, this Court found that taxpayers involved in a similar computer leasing structure were not at risk due primarily to the existence of matching, circular payments, guarantees, and the nonrecourse nature of the underlying debt.  Accord Thornock v. Commissioner, supra.

C.  Instant Cases

In the instant cases, sufficient factors are present that we must find that there was no realistic possibility that petitioner would suffer an economic loss on account of the installment notes if the underlying activities became unprofitable.

1.  Matching

In the computer equipment activity, Sha-Li was required to make monthly lease payments to petitioner of $6,928.79, petitioner was required to make monthly installment note payments to Proz of $6,908.79, and Proz was required to make monthly installment note payments to Sha-Li of $6,908.79.  All payment obligations were for the same term.  In the telecommunications equipment activity, all payment obligations--from RTS to petitioner as rent, from petitioner to Proz on the Proz telecommunications installment note, and from Proz to RTS on the petitioner telecommunications installment note--were identical both in amount and in term.  In both activities, petitioner's

obligation to Proz was matched (and, in the computer equipment activity, slightly exceeded) by the respective obligation of Sha-Li and RTS to petitioner.

### 2. Circularity

In both activities, not only were the payments matching, but the flow of payments was circular. It would thus appear to make no difference whether the payments were made or not, so long as each of the parties in the circle did the same thing. Indeed, in the telecommunications equipment activity, virtually no scheduled payments were made for the first 7 months. Payment lapses also occurred in the computer equipment activity. Moreover, in the telecommunications equipment activity, when the payments were automated, by instructing a bank to debit and credit each participant's account, the payments flowed the wrong way around the circle--from petitioner to RTS to Proz to petitioner, rather than from petitioner to Proz to RTS to petitioner--for over 7 years. Sha-Li performed bookkeeping services for Proz and RTS. A bookkeeper employed by Sha-Li discovered the reverse flow of payments in 1985 or 1986. The bookkeeper did not bring the reverse flow of payments to petitioner's attention. The parties have stipulated the reasons she failed to do so. Among those reasons are the following:

1. She believed that as president of RTS, petitioner had more important things to be concerned with,

2. By the time the bookkeeper learned of the reverse flow of payments, the payments had been circling in that

direction for several years, <u>without any apparent harm</u>.

No harm occurred in the sense that, since the required payments were to be equal (virtually equal in the computer equipment activity), it did not matter which way around the circle payments flowed. Likewise, it would not have mattered if payments flowed the right way around the circle but were made in only one-half the amounts called for under the various obligations. Indeed, from a simple balance sheet point of view, it would not have mattered if <u>no</u> payments ever were made. Unless the circle was broken, with the consequences visited on petitioner, then his obligations to Proz imposed no realistic possibility that he would suffer an economic loss. As the Court of Appeals for the Second Circuit said in <u>Waters v. Commissioner</u>, 978 F.2d at 1316-1317:

> if * * * [the party equivalent to Sha-Li or RTS]
> stopped making payments on its lease, it could only
> have expected a chain reaction resulting in * * * [the
> taxpayer], and then * * * [the middle entity] ceasing
> to make payments as well. Any ensuing litigation would
> similarly have resulted in a chain reaction. Whether
> or not a litigant would be entitled to setoff in a
> particular court action, it is clear that once the dust
> settled, the claims among the parties would have
> cancelled each other out.

### 3. Nonrecourse Nature of Underlying Bank Debt

Both the petitioner computer installment note and the petitioner telecommunications installment note are claimed by petitioner to be "limited recourse" obligations. Assuming that such obligations exposed petitioner to some personal liability,

such liability would only be theoretical for purposes of section 465(b)(4) during the years in question because of the underlying nonrecourse nature of the debts of Sha-Li and RTS to MHLC under the assignment agreements and the loan agreement, respectively. See Waters v. Commissioner, 978 F.2d at 1317.

Petitioners do not argue that the assignment agreements imposed any personal liability on Sha-Li, and we find that they did not. Petitioners do argue that the loan agreement (in the telecommunications equipment activity) did impose personal liability on RTS. The RTS promissory note states:

> MHLC ACKNOWLEDGES AND AGREES THAT THE PERSONAL LIABILITY OF * * * [RTS] WITH RESPECT TO PAYMENT OF SUMS EVIDENCED BY THIS NOTE IS LIMITED AND IS SUBJECT TO THE TERMS AND CONDITIONS CONTAINED IN THE SECURITY AGREEMENT.

Under the loan agreement, MHLC had recourse against RTS personally on the occasion of two events of default: One, the failure of RTS to observe certain covenants and other agreements, excluding its failure to pay amounts due, and, two, the failure of certain representations and warranties of RTS. Under the loan agreement, the rental payments expected from U.S. Telephone had been assigned to MHLC as "collateral security" for RTS' repayment of the RTS promissory note. MHLC also had a security interest in the telecommunications equipment. RTS bore no risk of default if U.S. Telephone failed to make those rental payments. If U.S. Telephone had stopped making payments under the U.S. Telephone lease, MHLC could have looked only to its "collateral security"

interests to recover its loss.  As it affects petitioner, the RTS promissory note was nonrecourse, and we so find.

### 4.  Payment Deferral Provisions

Both installment notes give petitioner the right to defer any or all note payments owed to Proz to the extent amounts due petitioner under the Sha-Li lease or the RTS lease, respectively, are not received when due.  Thus, even if the underlying debts of Sha-Li and RTS under the assignment agreements and the loan agreement, respectively, were not recourse, petitioner's obligations during the years in issue would be "theoretical", in the words of the Court of Appeals for the Second Circuit in Waters v. Commissioner, 987 F.2d at 1317.

### 5.  Indemnities

In connection with the computer equipment activity, under the Sha-Li lease, Sha-Li agreed to indemnify, hold harmless, and defend petitioner against certain risks and any losses attendant to those risks.  Included was any claim arising in connection with MHLC's security interest in the computer equipment or the assignment of payments due under the BNY leases to MHLC.  The indemnification provisions of the Sha-Li lease eliminate for petitioner any risk of default if MHLC stops receiving rent payments from BNY.

In connection with the telecommunications equipment activity, under the RTS lease, RTS agreed to indemnify petitioner and protect, defend, and hold him harmless from losses in any way

relating to or arising out of the U.S. Telephone lease.  While not as clear as the indemnification provision in the Sha-Li lease, we believe that the indemnification provisions of the RTS lease eliminate for petitioner any risk of default if MHLC stops receiving payments from U.S. Telephone.

> 6.  <u>Petitioners' U.C.C. Argument</u>

Petitioners argue:

> In sale leaseback transactions governed by the Uniform Commercial Code (e.g., the transactions in the case at bar), the institution financing the original acquisition by the leasing company (Manufacturer's) obtains a security interest in the middle company (Proz) and /or investor (Petitioner) Notes because said Notes constitute "proceeds" from the disposition of the collateral.  If the leasing company defaults (because, for example, the underlying end-user ceases paying rent), the original lending institution can enforce the middle company and/or investor Notes, directly or through the chain, to the extent that the proceeds from foreclosure and sale of the collateral (equipment) are insufficient to satisfy the outstanding balance of the leasing company's debt.

The result, petitioners argue, "is a break in the circle of payments".

N.Y. Uniform Commercial Code (U.C.C.) Law sec. 9-306(2) (McKinney 1990) provides:

> Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, <u>and also continues in any identifiable proceeds including collections received by the debtor</u>. [Emphasis added.]

The term "proceeds" is defined to include "whatever is received upon the sale, exchange, collection, or other disposition of collateral". N.Y.U.C.C. Law sec. 9-306(1) (McKinney 1990).

We need not get into the fine points of the commercial law involved. Assuming, for the sake of argument, that, upon the default of Sha-Li or RTS to MHLC, MHLC could have moved around the circle and ended up with petitioner being liable for any deficiency, we do not see how that aids petitioner. First, that did not happen during any of the years in question. We have found that both the assignment agreements and the loan agreement were nonrecourse debts. Sec. I.C.3., supra p. 27. The analysis of the Court of Appeals for the Second Circuit in Waters v. Commissioner, 978 F.2d at 1317, with regard to nonrecourse debt is apt:

> In any event, the pertinent "arrangement" to be assessed at the close of each taxable year was the existing nonrecourse debt, not the theoretical possibility that its nonrecourse nature would be disregarded by * * * [RTS] in some future contingency.

The commercial law consequences that petitioners put forth were both theoretical and contingent during the years in question, and do not change our analysis of the meaningless nature of the circle of payments. Second, the payment deferral provisions discussed above dilute even more the argument that petitioner had any present liability. Third, the indemnification provisions eliminate it entirely.

D. Conclusion

During the years in issue, petitioner was not at risk on account of either installment note. We therefore uphold respondent's determinations of deficiencies in tax as they relate thereto.

II. Additions to Tax

A. Negligence

Section 6653(a) imposes one addition to tax, and, in some cases, two additions to tax, where the taxpayer's underpayment is due to negligence or intentional disregard of rules or regulations (hereinafter referred to simply as negligence). Section 6653(a), as applicable for 1980, and section 6653(a)(1), as applicable for 1981 through 1983, impose an addition to tax equal to 5 percent of the entire underpayment if any portion of such underpayment is due to negligence. Section 6653(a)(2), as applicable for 1981 through 1983, imposes an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment due to negligence (the interest-sensitive addition to tax). Petitioners bear the burden of proof. Rule 142(a).

An underpayment, for purposes of section 6653(a), is the amount by which the tax liability exceeds the tax shown on a timely filed return. Secs. 6653(c)(1), 6211(a). The parties have stipulated that petitioners did not timely file their 1980 and 1981 Federal income tax returns. Therefore, for 1980 and

1981, inasmuch as there was no timely filed return, the amount shown on a timely filed return is zero, and the underpayment equals the entire tax liability. Emmons v. Commissioner, 92 T.C. 342, 348-349 (1989), affd. 898 F.2d 50 (5th Cir. 1990). When an underpayment is caused by the taxpayer's failure to file timely an income tax return, such underpayment is due to negligence if the taxpayer lacks reasonable cause for such failure. See id. at 349. The parties have also stipulated that petitioners lacked reasonable cause for failing to file timely their 1980 and 1981 Federal income tax returns. Accordingly, normally, we would find that the entire underpayment for each of those years is due to negligence, and we would sustain respondent's additions to tax under section 6653(a) for 1980 and under section 6653(a)(1) and (2) for 1981. However, the parties have additionally stipulated that petitioners "are not liable for additions to tax pursuant to I.R.C. §§ 6653(a)(1) and §6653(a)(2) as a result of * * * [certain properly disallowed deductions] for their 1980, 1981, or 1982 taxable years". Also, respondent has determined the interest-sensitive addition to tax with regard to only a portion of the 1981 underpayment. We are at a loss to reconcile the stipulations respondent has joined, her determination of the interest-sensitive addition for 1981, and the rule of Emmons v. Commissioner, supra at 348-349. We assume that respondent has chosen not to rely on Emmons for 1980 and 1981. We will treat respondent as having made a concession to that extent.

We have sustained respondent's disallowance of certain items for each of the years in issue. For none of those years have petitioners carried their burden of showing the absence of an underpayment. Accordingly, we find some underpayment for each of those years. That is not sufficient for us to determine any addition to tax on account of negligence, however. We must determine whether petitioners were indeed negligent. Negligence for purposes of section 6653(a) is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Petitioners focus on the computer equipment activity and the telecommunications activity and argue first that they cannot be negligent in claiming their losses therefrom because respondent has stipulated that the activities were not a sham, that petitioner had a business purpose, that the investments had substance, and that petitioner acquired the benefits and burdens of ownership. We do not agree with petitioners. The consequence of that stipulation is to limit our inquiry with regard to the activities to the question of whether petitioners were negligent in taking the position that petitioner was at risk within the meaning of section 465(a) with regard to the installment notes. With regard to that question, petitioners argue:

> Petitioner, who himself was a longtime expert in structuring leasing transactions, and who relied on the many professionals associated with the transactions, including but not limited to * * * [certain] major New York law firms * * * and independent tax counsel (who either negotiated, reviewed or drafted the documents in issue and advised Petitioner) believed that he would be "at risk" with respect to the Notes he signed in the transactions.  * * *

As a general rule, the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer or other expert.  See, e.g., Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987).  Nevertheless, this Court has declined to sustain additions to tax under section 6653(a) in cases in which the taxpayer relied in good faith on the advice of a tax expert.  See, e.g., Woodbury v. Commissioner, 49 T.C. 180, 199 (1967); Brown v. Commissioner, 47 T.C. 399, 410 (1967), affd. per curiam 398 F.2d 832 (6th Cir. 1968); Donlon I Dev. Corp. v. Commissioner, T.C. Memo. 1993-374.  However, a close examination of these cases reveals that they raised questions as to the tax treatment of complex transactions and that the position taken on the returns with respect to such items had a reasonable basis.

We do not believe that petitioners have satisfied those criteria.  Petitioner is a self-proclaimed expert in structuring leasing transactions.  Therefore, for him, the activities in question were not complex.  Moreover, petitioners have not carried their burden of showing that petitioner relied on expert opinion that the at-risk positions in question had a reasonable basis in law.  Petitioner testified that he consulted with

various attorneys and others in structuring certain aspects of the activities.  Nevertheless, he has not convinced us that he exposed the whole of each activity to a qualified expert and obtained a reasonable opinion, or any other opinion, as to whether petitioner was at risk within the meaning of section 465(a).  For each of the years in question, we find that petitioners were negligent in claiming the losses they did from the activities.

Accordingly, for 1980, we uphold respondent's determination of an addition to tax pursuant to section 6653(a) and, for 1981 through 1983, we uphold respondent's determination of an addition to tax pursuant to section 6653(a)(1).  Also for 1981 through 1983, we uphold respondent's determinations of additions to tax pursuant to section 6653(a)(2), except to the extent that such additions relate to the parties' stipulation that petitioners are not liable for additions to tax pursuant to that section with respect to certain portions of the underpayments.

B.  Substantial Understatement of Income Tax Liability

Respondent has determined additions to tax under section 6661 for 1982 and 1983.  Section 6661(a) provides for an addition to the tax for any year for which there is a substantial understatement of income tax.  A substantial understatement is defined as an understatement which exceeds the greater of 10 percent of the tax required to be shown on the return for the year or $5,000.  Sec. 6661(b)(1)(A).  The amount of the addition

to tax is 25 percent of the underpayment attributable to a substantial understatement.  <u>Pallottini v. Commissioner</u>, 90 T.C. 498 (1988).  The amount of the understatement, however, is reduced by amounts attributable to items for which (1) there existed substantial authority for the taxpayer's position, or (2) the taxpayer disclosed relevant facts concerning the items with his tax return.  Sec. 6661(b)(2)(B).

If, however, the understatement is attributable to a tax shelter, disclosure of the item will not enable the taxpayer to avoid the addition, and the substantial authority test will not apply unless the taxpayer can show that he reasonably believed the treatment causing the understatement was more likely than not proper.  Sec. 6661(b)(2)(C)(i).  The term "tax shelter" includes "any investment plan or arrangement * * * if the principal purpose of such * * * plan, or arrangement is the avoidance or evasion of Federal income tax."  Sec. 6661(b)(2)(C)(ii).  Section 1.6661-5(b)(iii), Income Tax Regs., interprets the term "tax shelter" as follows:

> The principal purpose of an entity, plan, or arrangement is the avoidance or evasion of Federal income tax if that purpose exceeds any other purpose. * * * Typical of tax shelters are transactions structured with * * * nonrecourse financing * * *.  The existence of economic substance does not of itself establish that a transaction is not a tax shelter if the transaction includes other characteristics that indicate it is a tax shelter.

Section 1.6661-5(a), Income Tax Regs., specifies that, to meet the reasonable belief standard of section 6661(b)(2)(C)

(i)(II), the taxpayer must reasonably believe at the time the return is filed that the tax treatment claimed is more likely than not the proper tax treatment. Section 1.6661-5(d), Income Tax Regs., specifies where a taxpayer will be considered reasonably to believe that the tax treatment of an item is more likely than not the proper tax treatment: First, if the taxpayer himself analyzes the pertinent facts and authorities and, on the basis thereof, reasonably concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld in litigation with the Internal Revenue Service. Second, if the taxpayer in good faith relies on the opinion of a professional tax adviser who makes a similar analysis and unambiguously states a similar conclusion.

Petitioners bear the burden of proof. Rule 142(a).

The record is clear that there are substantial understatements in tax for both 1982 and 1983 unless the amounts that would otherwise be understatements for such years are reduced pursuant to section 6661(b)(2)(B). Petitioners argue that there is substantial authority supporting their position that petitioner was at risk within the meaning of section 465(a) with regard to both installment notes. Indeed, in Waters v. Commissioner, T.C. Memo. 1991-462, which involved an equipment leasing transaction, we found that the taxpayer had substantial authority for claiming the deductions relating to his participation in the transaction. Based on that finding, we

concluded that no addition to tax under section 6661 should be imposed. We did not in Waters consider whether the transaction constituted a tax shelter. Respondent has made that claim here, and so we must make certain preliminary determinations before getting to the question of substantial authority.

We find that both activities constitute tax shelters within the meaning of section 6661(b)(2)(C)(ii). We are aware that respondent has stipulated that neither activity was a sham, that petitioner had a business purpose in entering each, that petitioner's investments had substance, and that he acquired the benefits and burdens of ownership. We have taken similar stipulations into account in finding that a leasing transaction was not a tax shelter. Martuccio v. Commissioner, T.C. Memo. 1992-311, revd. on other grounds 30 F.3d 743 (6th Cir. 1994); Epsten v. Commissioner, T.C. Memo. 1991-252. Nevertheless, we believe that here the principal purpose of both activities was the avoidance of Federal income tax. Both activities produced substantial tax losses for the years in question. Both involved nonrecourse financing. The circular flow of matching payments, combined with the nonrecourse nature of the underlying debt, meant that any personal liability of petitioner's on the installment notes was at best contingent and theoretical during the years in issue. Petitioner enjoyed indemnities and deferral provisions. If petitioner bore any risk at all with respect to either installment note, it could only have ripened into a

present obligation at the end of the relevant deferral period. Accordingly, there was little substance to the risk of loss that the installment notes, in form, presented.  Indeed, the financial structure of both activities was designed to give the impression, but not to reflect the reality, of petitioner's being at risk with respect to the installment notes.  The middle company, Proz, was inserted into each activity solely for tax reasons; petitioner has failed to convince us that Proz was organized or utilized for any purpose but to avoid the adverse application of section 465.  Our overall impression of both activities is that each is inconsistent with Congress' purpose, writ large in every aspect of section 465, to limit a taxpayer's losses to amounts for which he is really at risk.  The structure and operation of both activities is indicative that petitioner's principal purpose with regard to each was the avoidance of Federal income tax.  See sec. 1.6661-5(b)(2), Income Tax Regs.  Moreover, petitioner has not shown us that his business purpose in entering either activity exceeded the obvious purposes of tax avoidance. Petitioner has proposed no findings that, either on a before-tax or after-tax basis, detail his financial expectations. Petitioner clearly paid very little attention to the activities once they were up and running and his risk of personal liability had been eliminated, or at least postponed.  Petitioner has stipulated that Sha-Li's bookkeeper did not tell him about the wrong-way flow of funds in the telecommunications equipment

activity because she believed that "he had more important things to be concerned with".  The parties to the two activities missed payments for months on end.  For the reasons stated, we are convinced that both activities constitute tax shelters within the meaning of section 6661(b)(2)(C)(ii).

Because both activities constitute tax shelters, petitioner cannot rely on substantial authority unless, at the time the 1982 and 1983 returns were filed, he reasonably believed that the tax treatment claimed was more likely than not the proper tax treatment.  See sec. 6661(b)(2)(C)(i)(II); sec. 1.6661-5(a), Income Tax Regs.  Petitioner testified that, in both activities, he acquired the equipment in question through Proz in order to satisfy his and certain of his advisers' concerns regarding section 465.  We have no doubt that petitioner and his advisers considered the tax results to petitioner of both activities.  Nevertheless, there is no evidence for us to find that petitioner analyzed the pertinent facts and authorities and, in the manner contemplated in section 1.6661-5(d)(1), Income Tax Regs., reasonably concluded that there was a greater than 50-percent likelihood that the tax treatment of the claimed losses from either the computer equipment activity or the telecommunications activity would be upheld in litigation.  Also, there is no such unambiguous opinion from a tax adviser.  See sec. 1.6661-5(d)(2), Income Tax Regs.  Accordingly, we find that petitioner did not reasonably believe when petitioners filed the returns in question

that the tax treatment of the items giving rise to the losses from either the computer equipment activity or the telecommunications activity was more likely than not the proper treatment.

Accordingly, petitioners cannot claim that there was substantial authority that would allow them to reduce the amounts of understatements on their returns. See sec. 6661(b)(2)(b) and (c). Other than substantial authority, petitioners have set forth no other pertinent defenses to the additions for substantial understatement of liability. We find that petitioners are liable for such additions as determined by respondent.

## III. Increased Interest

Respondent also seeks increased interest pursuant to section 6621(c). That section provides for an increase in the interest rate to 120 percent of the statutory rate on underpayments of tax if a substantial understatement is due to a tax-motivated transaction. Certain transactions are deemed to be "tax motivated" by section 6621(c)(3), including any loss disallowed under section 465(a). Sec. 6621(c)(3)(A)(ii). Since we have concluded that the loss deductions in issue stemming from the installment notes are disallowed under section 465(a), we also find that the activities were tax-motivated transactions, and respondent is entitled to additional interest on the interest

accruing on the portion of the underpayments attributable to such transactions after December 31, 1984.

Decisions will be entered

under Rule 155.